# UNITED STATES *v.* AGUILAR

No. 94–270.   Argued March 20, 1995—Decided June 21, 1995

594

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-NOR, SOUTER, GINSBURG, and BREYER, JJ., joined, in Part I of which STE-VENS, J., joined, and in all but Part I and the last paragraph of Part II of which SCALIA, KENNEDY, and THOMAS, JJ., joined. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 606. SCALIA, J., filed an opinion concurring in part and dissenting in part, in which KENNEDY and THOMAS, JJ., joined, *post*, p. 609.

*James A. Feldman* argued the cause for the United States. With him on the briefs were *Solicitor General Days, Assistant Attorney General Harris, Deputy Solicitor General Dreeben,* and *Patty Merkamp Stemler.*

*Robert D. Luskin* argued the cause for respondent. With him on the brief were *Joseph G. Davis* and *Paul B. Meltzer.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

A jury convicted United States District Judge Robert Aguilar of one count of illegally disclosing a wiretap in violation of 18 U. S. C. § 2232(c), and of one count of endeavoring to obstruct the due administration of justice in violation of § 1503. A panel of the Court of Appeals for the Ninth Circuit affirmed the conviction under § 2232(c) but reversed the conviction under § 1503. After rehearing en banc, the Court of Appeals reversed both convictions. We granted certiorari to resolve a conflict among the Federal Circuits over whether § 1503 punishes false statements made to potential grand jury witnesses, and to answer the important question whether disclosure of a wiretap after its authorization expires violates § 2232(c). 513 U. S. 1013 (1994).

Many facts remain disputed by the parties. Both parties appear to agree, however, that a motion for postconviction relief filed by one Michael Rudy Tham represents the starting point from which events bearing on this case unfolded. Tham was an officer of the International Brotherhood of Teamsters, and was convicted of embezzling funds from the local affiliate of that organization. In July 1987, he filed a motion under 28 U. S. C. § 2255 to have his conviction set aside. The motion was assigned to Judge Stanley Weigel. Tham, seeking to enhance the odds that his petition would be granted, asked Edward Solomon and Abraham Chalupowitz, a.k.a. Abe Chapman, to assist him by capitalizing on their respective acquaintances with another judge in the Northern District of California, respondent Aguilar. Respondent knew Chapman as a distant relation by marriage and knew Solomon from law school. Solomon and Chapman met with

---

*Gerald B. Lefcourt* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging affirmance.

respondent to discuss Tham's case, as a result of which respondent spoke with Judge Weigel about the matter.

Independent of the embezzlement conviction, the Federal Bureau of Investigation (FBI) identified Tham as a suspect in an investigation of labor racketeering. On April 20, 1987, the FBI applied for authorization to install a wiretap on Tham's business phones. Chapman appeared on the application as a potential interceptee. Chief District Judge Robert Peckham authorized the wiretap. The 30-day wiretap expired by law on May 20, 1987, 18 U. S. C. § 2518(5), but Chief Judge Peckham maintained the secrecy of the wiretap under § 2518(8)(d) after a showing of good cause. During the course of the racketeering investigation, the FBI learned of the meetings between Chapman and respondent. The FBI informed Chief Judge Peckham, who, concerned with appearances of impropriety, advised respondent in August 1987 that Chapman might be connected with criminal elements because Chapman's name had appeared on a wiretap authorization.

Five months after respondent learned that Chapman had been named in a wiretap authorization, he noticed a man observing his home during a visit by Chapman. He alerted his nephew to this fact and conveyed the message (with an intent that his nephew relay the information to Chapman) that Chapman's phone was being wiretapped. Respondent apparently believed, in error, both that Chapman's phones were tapped in connection with the initial application and that the initial authorization was still in effect. Chief Judge Peckham had in fact authorized another wiretap on Tham's phones effective from October 1987 through the period in which respondent made the disclosure, but there is no suggestion in the record that the latter had any specific knowledge of this reauthorization.

At this point, respondent's involvement in the two separate Tham matters converged. Two months after the disclo-

sure to his nephew, a grand jury began to investigate an alleged conspiracy to influence the outcome of Tham's habeas case. Two FBI agents questioned respondent. During the interview, respondent lied about his participation in the Tham case and his knowledge of the wiretap. The grand jury returned an indictment; a jury convicted Aguilar of one count of disclosing a wiretap, 18 U. S. C. § 2232(c), and one count of endeavoring to obstruct the due administration of justice, § 1503. A panel of the Court of Appeals for the Ninth Circuit affirmed the § 2232(c) conviction but reversed the § 1503 conviction.

On rehearing en banc, the Court of Appeals reversed both convictions for the reason that the conduct in each instance was not covered by the statutory language. 21 F. 3d 1475 (1994). The court concluded that § 2232(c) requires the disclosure of a pending wiretap application or an authorization that had not expired because the purpose of the statute was to thwart interference with the "'possible interception'" of the wiretap of which the defendant had knowledge. *Id.*, at 1480. Finding the interception in this case impossible once the authorization had expired, it held respondent's disclosure was not covered by the plain language of the statute. The Court of Appeals also found that respondent had not interfered with a pending judicial proceeding under § 1503. It first noted that the grand jury had not authorized or directed the FBI investigation. It then held that merely uttering false statements does not "'corruptly influence'" within the meaning of the statute. *Id.*, at 1485–1486. It drew this conclusion, in part, from 1988 amendments to § 1512, which added a prohibition on corrupt persuasion of witnesses. The court read the corrupt persuasion prohibited by § 1512 to require an active attempt to persuade a witness to tell a false story, and used the language in § 1512 as a guide to interpret the omnibus clause of § 1503 narrowly.

I

Section 1503 provides:

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or *corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice*, shall be fined not more than $5,000 or imprisoned not more than five years, or both." 18 U. S. C. § 1503 (emphasis added).

The statute is structured as follows: first it proscribes persons from endeavoring to influence, intimidate, or impede grand or petit jurors or court officers in the discharge of their duties; it then prohibits injuring grand or petit jurors in their person or property because of any verdict or indictment rendered by them; it then prohibits injury of any court officer, commissioner, or similar officer on account of the performance of his official duties; finally, the "Omnibus Clause" serves as a catchall, prohibiting persons from endeavoring to influence, obstruct, or impede the due administration of justice. The latter clause, it can be seen, is far more general in scope than the earlier clauses of the statute. Respondent

was charged with a violation of the Omnibus Clause, to wit: with "corruptly endeavor[ing] to influence, obstruct, and impede the . . . grand jury investigation." App. 106.

The first case from this Court construing the predecessor statute to § 1503 was *Pettibone* v. *United States,* 148 U. S. 197 (1893). There we held that "a person is not sufficiently charged with obstructing or impeding the due administration of justice in a court unless it appears that he knew or had notice that justice was being administered in such court." *Id.,* at 206. The Court reasoned that a person lacking knowledge of a pending proceeding necessarily lacked the evil intent to obstruct. *Id.,* at 207. Recent decisions of Courts of Appeals have likewise tended to place metes and bounds on the very broad language of the catchall provision. The action taken by the accused must be with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority. *United States* v. *Brown,* 688 F. 2d 596, 598 (CA9 1982) (citing cases). Some courts have phrased this showing as a "nexus" requirement—that the act must have a relationship in time, causation, or logic with the judicial proceedings. *United States* v. *Wood,* 6 F. 3d 692, 696 (CA10 1993); *United States* v. *Walasek,* 527 F. 2d 676, 679, and n. 12 (CA3 1975). In other words, the endeavor must have the "'natural and probable effect'" of interfering with the due administration of justice. *Wood, supra,* at 695; *United States* v. *Thomas,* 916 F. 2d 647, 651 (CA11 1990); *Walasek, supra,* at 679. This is not to say that the defendant's actions need be successful; an "endeavor" suffices. *United States* v. *Russell,* 255 U. S. 138, 143 (1921). But as in *Pettibone,* if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct.

Although respondent urges various broader grounds for affirmance,[1] we find it unnecessary to address them because we think the "nexus" requirement developed in the decisions of the Courts of Appeals is a correct construction of § 1503. We have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress, *Dowling* v. *United States*, 473 U. S. 207 (1985), and out of concern that "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed," *McBoyle* v. *United States*, 283 U. S. 25, 27 (1931). We do not believe that uttering false statements to an investigating agent—and that seems to be all that was proved here—who might or might not testify before a grand jury is sufficient to make out a violation of the catch-all provision of § 1503.

The Government did not show here that the agents acted as an arm of the grand jury, or indeed that the grand jury had even summoned the testimony of these particular agents. The Government argues that respondent "understood that his false statements would be provided to the grand jury" and that he made the statements with the intent to thwart the grand jury investigation and not just the FBI investigation. Brief for United States 18. The Government supports its argument with a citation to the transcript of the recorded conversation between Aguilar and the FBI agent at the point where Aguilar asks whether he is a target of a grand jury investigation. The agent responded to the question by stating:

> "[T]here is a Grand Jury meeting. Convening I guess that's the correct word. Um some evidence will be heard I'm . . . I'm sure on this issue." App. 86.

---

[1] Respondent argues that the term "corruptly" is vague and overbroad as applied to the type of conduct at issue in this case and that Congress narrowed the scope of the Omnibus Clause when it expressly punished his conduct in 18 U. S. C. § 1512.

Because respondent knew of the pending proceeding, the Government therefore contends that Aguilar's statements are analogous to those made directly to the grand jury itself, in the form of false testimony or false documents.[2]

We think the transcript citation relied upon by the Government would not enable a rational trier of fact to conclude that respondent knew that his false statement would be provided to the grand jury, and that the evidence goes no further than showing that respondent testified falsely to an investigating agent. Such conduct, we believe, falls on the other side of the statutory line from that of one who delivers false documents or testimony to the grand jury itself. Conduct of the latter sort all but assures that the grand jury will consider the material in its deliberations. But what use will be made of false testimony given to an investigating agent who has not been subpoenaed or otherwise directed to appear before the grand jury is far more speculative. We think it cannot be said to have the "natural and probable effect" of interfering with the due administration of justice.

JUSTICE SCALIA criticizes our treatment of the statutory language for reading the word "endeavor" out of it, inasmuch as it excludes defendants who have an evil purpose but use means that would "only unnaturally and improbably be successful." *Post*, at 612. This criticism is unwarranted. Our reading of the statute gives the term "endeavor" a useful function to fulfill: It makes conduct punishable where the defendant acts with an intent to obstruct justice, and in a manner that is likely to obstruct justice, but is foiled in some

---

[2] See, *e. g.*, *United States* v. *Mullins*, 22 F. 3d 1365, 1367–1368 (CA6 1994) (altered records and instructed co-worker to alter records subject to subpoena *duces tecum*); *United States* v. *Williams*, 874 F. 2d 968, 976–982 (CA5 1989) (uttered false testimony to grand jury); *United States* v. *McComb*, 744 F. 2d 555, 559 (CA7 1984) (created false meeting minutes and voluntarily delivered them to grand jury); *United States* v. *Faudman*, 640 F. 2d 20, 23 (CA6 1981) (falsified records, some of which had been sought by subpoena *duces tecum*); *United States* v. *Walasek*, 527 F. 2d 676, 679–680 (CA3 1975) (falsified documents requested by subpoena *duces tecum*).

way. Were a defendant with the requisite intent to lie to a subpoenaed witness who is ultimately not called to testify, or who testifies but does not transmit the defendant's version of the story, the defendant has endeavored to obstruct, but has not actually obstructed, justice. Under our approach, a jury could find such defendant guilty.

JUSTICE SCALIA also apparently believes that *any* act, done with the intent to "obstruct . . . the due administration of justice," is sufficient to impose criminal liability. Under the dissent's theory, a man could be found guilty under § 1503 if he knew of a pending investigation and lied to his wife about his whereabouts at the time of the crime, thinking that an FBI agent might decide to interview her and that she might in turn be influenced in her statement to the agent by her husband's false account of his whereabouts. The intent to obstruct justice is indeed present, but the man's culpability is a good deal less clear from the statute than we usually require in order to impose criminal liability.

## II

Section 2232(c) prohibits the disclosure of information that a wiretap has been sought or authorized. The statute reads:

> "Whoever, having knowledge that a Federal investigative or law enforcement officer has been authorized or has applied for authorization under chapter 119 to intercept a wire, oral, or electronic communication, in order to obstruct, impede, or prevent such interception, gives notice or attempts to give notice of the possible interception to any person shall be fined under this title or imprisoned not more than five years, or both." 18 U. S. C. § 2232(c).

This section is much more precisely targeted than is the catchall provision of § 1503 discussed above. The first clause defines the element of knowledge required for the act to be criminal: knowledge that an officer has been authorized or

has sought authorization to intercept a communication. The second clause defines the required intent with which the act be done: "in order to obstruct, impede, or prevent such interception." The third clause defines the punishable act: "gives notice or attempts to give notice of the possible interception." Respondent persuaded the Court of Appeals to hold that the wiretap application or authorization must be pending or *in esse* at the time of the disclosure, but we do not believe any such requirement is to be found in the statutory language.

Respondent here urges the reasoning accepted by the Court of Appeals. "[T]he purpose of the statute is to prevent interference with 'possible interception.'" 21 F. 3d, at 1480. Once a wiretap has expired or been denied, the Ninth Circuit reasoned, there is no "'possible interception'" to disclose or attempt to disclose. *Ibid.* The narrow purpose of the statute is further evidenced by the statute's intent requirement, which limits punishable disclosures to those undertaken with the intent to interfere with "'such interception'" of which the defendant "has knowledge." *Ibid.* Under the circumstances, the disclosure of an expired wiretap not only fails to violate the terms of the statute, it fails to implicate any interest protected by § 2232(c). Brief for Respondent 38.

But this argument, we think, fails in the face of the statutory language itself. The term "such interception" is part of the intent requirement in the second clause; the defendant must intend to obstruct the interception made pursuant to the application or authorization of which he has the knowledge required by the first clause. The phrase "possible interception" is found in the third clause, which describes the act which offends the statute. A defendant intending to disclose the existence of a pending application would ordinarily have no way of knowing whether the application or authorization had resulted in an interception, and that is doubtless why the third clause uses the term "possible" interception.

It was not intended to limit the offense to cases where the interception based upon the application or authorization was factually possible, but to recognize the fact that at the time the prohibited notice was given it very likely could not be known whether or not there would be an interception.

The Court of Appeals thought its result justified by its view that the aim of the statute was to prevent interference with "possible" interceptions, and that if an interception was not possible because the wiretap was no longer in place at the time of the disclosure, that interest was not threatened. But the statute is aimed at something more than the interference with interceptions; it is aimed at disclosure of wiretap orders or applications which may lead to interceptions. The offense is complete at the time the notice is given, when it often cannot be known whether any interception will take place.

JUSTICE STEVENS argues that §2232(c) criminalizes disclosures of pending applications without a need to rely on the word "'possible.'" *Post*, at 608. That is not so. The reference to pending applications occurs only in the clause specifying the knowledge element. The *actus reus* element must be independently satisfied. Without the word "possible," the statute would only prohibit giving notice of "the interception": It would not reach the giving of notice of an application which has not yet resulted in an authorization or an authorization which has not yet resulted in an interception. That Congress could have accomplished the same result by phrasing the statute differently—for instance, by repeating "'such interception'" in the third clause, *ibid.*—does not undercut the fact that the word "possible" is necessary in the statute *as written* to criminalize such behavior.[3]

---

[3] JUSTICE STEVENS also argues that our reading of the statute would achieve no temporal limitation on liability and could result in the "absurd" prosecution of a discloser 10 years after the wiretap expired. *Post*, at 608–609. Although we reserve the question for a case that presents it, we note that the wiretapping scheme as a whole suggests that a plausible

Acceptance of respondent's position would open the door to additional claims of "impossibility" other than the fact that the application or order was not pending at the time of the disclosure. Some sort of mechanical failure, or the departure of the person whose conversation was to be intercepted from the place at which the reception was authorized, are two which come to mind. In *Osborn* v. *United States*, 385 U. S. 323, 333 (1966), we expressed reservations about the "continuing validity [of] the doctrine of 'impossibility,' with all its subtleties," in the law of criminal attempt, and we would require much more than the statutory language before us to believe that Congress intended to engraft it onto the language of § 2232(c).

Finally, respondent urges us to read the statute to exclude disclosures of expired wiretaps because of concern that a broader construction would run counter to the First Amendment. We see no necessity for such a restrictive construction of the statute. It is true that the Government may not generally restrict individuals from disclosing information that lawfully comes into their hands in the absence of a "state interest of the highest order." *Smith* v. *Daily Mail Publishing Co.*, 443 U. S. 97, 103 (1979). But the statute here in question does not impose such a restriction generally, but only upon those who disclose wiretap information "in order to obstruct, impede, or prevent" the interception. Nor was the respondent simply a member of the general

---

temporal limit on liability for disclosure would be the point at which the authorizing judge notifies the interceptee and related parties of the existence of an application or authorization pursuant to 18 U. S. C. § 2518(8)(d). Such notification must occur "within a reasonable time" after denial of the application or termination of a wiretap, and may be postponed only upon a showing of "good cause." § 2518(8)(d). The parties did not brief this issue, and we need not decide it on these facts because respondent disclosed his knowledge of the wiretap application before Chief Judge Peckham notified the parties in May 1989. That notification issued two years after the FBI first applied for authorization and one year after the last authorized wiretap expired.

public who happened to lawfully acquire possession of information about the wiretap; he was a Federal District Court Judge who learned of a confidential wiretap application from the judge who had authorized the interception, and who wished to preserve the integrity of the court. Government officials in sensitive confidential positions may have special duties of nondisclosure. See Fed. Rule Crim. Proc. 6(e) (prohibiting the disclosure of grand jury information). Likewise, protective orders may be imposed in connection with information acquired through civil discovery without violating the First Amendment. *Seattle Times Co.* v. *Rhinehart*, 467 U. S. 20, 31 (1984). As to one who voluntarily assumed a duty of confidentiality, governmental restrictions on disclosure are not subject to the same stringent standards that would apply to efforts to impose restrictions on unwilling members of the public. See *Snepp* v. *United States*, 444 U. S. 507 (1980) *(per curiam)*. In this case, Chief Judge Peckham postponed the notification of parties named in the application in order to maintain the secrecy of the wiretap. See 18 U. S. C. § 2518(1)(d). We think the Government's interest is quite sufficient to justify the construction of the statute as written, without any artificial narrowing because of First Amendment concerns.

Respondent raised below a challenge to the jury instructions, but the Court of Appeals found it unnecessary to decide. We affirm the decision of the Court of Appeals with respect to respondent's conviction under § 1503 and reverse with respect to respondent's conviction under § 2232(c). We remand for proceedings consistent with this decision.

*So ordered.*

JUSTICE STEVENS, concurring in part and dissenting in part.

Although I agree with the Court's disposition of the 18 U. S. C. § 1503 issue, and also with its rejection of the First

Amendment challenge to respondent's conviction for disclosing a wiretap application under § 2232(c), I believe the Court of Appeals correctly construed § 2232(c) to invalidate respondent's conviction under that statute.

When respondent was convicted of disclosing a 30-day wiretap authorization that had expired months before the disclosure, he was convicted of an attempt to do the impossible: interfere with a nonexistent wiretap. Traditionally, the law does not proscribe an attempt unless the defendant's intent is accompanied by "a dangerous probability that [the unlawful result] will happen." *Swift & Co.* v. *United States,* 196 U. S. 375, 396 (1905) (Holmes, J.). Whether such a dangerous probability exists, of course, depends ultimately on what result we interpret the statute as having declared unlawful. See 2 W. LaFave & A. Scott, Substantive Criminal Law § 6.3, pp. 44–45 (1986). In this case, there was no dangerous probability that respondent actually would reveal the existence of a wiretap or wiretap application because none existed to reveal. We should abjure a construction of a criminal statute that leads to criminalizing nothing more than an evil intent accompanied by a harmless act, particularly when, as here, the statutory language does not clearly extend liability so far. Cf. *Simpson* v. *United States,* 435 U. S. 6, 14–15 (1978).

Indeed, the text of § 2232(c) favors a reading that requires, as an essential element of the offense, the possibility of interference with an authorized interception. Both the second and third clauses of the statute support this straightforward interpretation. The second clause requires that the defendant intend to impede "such interception." That phrase refers to an interception that the defendant knows a federal officer "has been authorized or has applied for authorization" to make. After the authorization expires, no "such interception" can occur. Moreover, to infer that "such interception" includes any interception that might be made pursuant to any subsequent reauthorization severely undermines the

statute's knowledge requirement by making actual knowledge of an initial, limited authorization the linchpin of liability for disclosing later, entirely conjectural or nonexistent authorizations. That inference contradicts our usual practice of giving strict effect to scienter provisions. See, *e. g.*, *United States* v. *X-Citement Video, Inc.*, 513 U. S. 64, 68–71 (1994).

The third clause of §2232(c) describes the notice that a defendant must attempt to give a third person in order to violate the statute as notice of "*the* possible interception." The definite article necessarily refers to an interception that is "authorized" (or for which federal officers have applied for authorization) per the second clause, thereby imposing authorization as a requirement to satisfy the next word, "possible." I agree with the Court that interceptions prevented by mechanical failures or the departure of the suspect are "possible" within the meaning of the statute, see *ante*, at 603–604, as long as those interceptions, however unlikely, are legally "authorized." The wholly theoretical interception that respondent was convicted of attempting to impede was not authorized, nor had federal officers even sought authorization for it; therefore, it was not "possible" within the meaning of the statute.

The Court's attempt to explain the word "possible" as an assurance that the statute will cover interceptions that may or may not result from a pending application, see *ante*, at 604, is unpersuasive. Because the statute plainly criminalizes disclosures of pending applications, "possible" does not need to do the work the Court assigns it. The phrase "such interception," already used in the second clause, would do just as well. The function of "possible" must be to place some temporal limitation on potential liability under the statute. Under the Court's reasoning, respondent could be found guilty if he had disclosed a 10-year-old application or authorization. The word "possible," properly understood, would prevent such an absurd result by limiting liability to

interceptions that could actually be made pursuant to present or pending authorization.

As the Court notes in response to this opinion, see *ibid.*, under its reading the third clause serves to define the *actus reus* element of the crime, just as Congress could have done by replacing the phrase "notice of the possible interception" with the unambiguous phrase "notice of such authorization or application." That unambiguous language, however, would not achieve the temporal limitation on liability that I believe Congress intended to achieve with the words "possible interception." The Court appears to acknowledge the need for such a limitation. See *ante*, at 604–605, n. 3. Rather than recognizing the limitation the statute contains, however, the Court hints that it might in some future case invent one. Limiting liability to the time before the authorizing judge announces the wiretap may well be "plausible," *ibid.*, but no plausible basis exists for finding that limitation in the words of the statute. A wiser course than judicial legislation, I submit, is simply to adopt a literal, reasonable construction of the text that Congress drafted.

I would affirm the decision of the Court of Appeals in its entirety.

JUSTICE SCALIA, with whom JUSTICE KENNEDY and JUSTICE THOMAS join, concurring in part and dissenting in part.

I join all but Part I and the last paragraph of Part II of the Court's opinion. I would reverse the Court of Appeals, and would uphold respondent's conviction, on the count charging violation of 18 U. S. C. § 1503.

## I

The "omnibus clause" of § 1503, under which respondent was charged, provides:

> "Whoever . . . corruptly or by threats or force, or by any threatening letter or communication, influences, ob-

structs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

This makes criminal not just success in corruptly influencing the due administration of justice, but also the "endeavor" to do so. We have given this latter proscription, which respondent was specifically charged with violating, see App. 106–107, a generous reading: "The word of the section is 'endeavor,' and by using it the section got rid of the technicalities which might be urged as besetting the word 'attempt,' and it describes *any effort or essay* to accomplish the evil purpose that the section was enacted to prevent." *United States* v. *Russell*, 255 U. S. 138, 143 (1921) (emphasis added) (interpreting substantially identical predecessor statute). Under this reading of the statute, it is even immaterial whether the endeavor to obstruct pending proceedings is possible of accomplishment. In *Osborn* v. *United States*, 385 U. S. 323, 333 (1966), we dismissed out of hand the "impossibility" defense of a defendant who had sought to convey a bribe to a prospective juror through an intermediary who was secretly working for the Government. "Whatever continuing validity," we said, "the doctrine of 'impossibility' . . . may continue to have in the law of criminal attempt, that body of law is inapplicable here." *Ibid.* (footnote omitted).[1]

Even read at its broadest, however, § 1503's prohibition of "endeavors" to impede justice is not without limits. To "endeavor" means to strive or work for a certain end. Webster's New International Dictionary 844 (2d ed. 1950); 1 New

---

[1] This complete disavowal of the impossibility defense may be excessive. As *Pettibone* v. *United States*, 148 U. S. 197 (1893), acknowledged, an endeavor to obstruct proceedings that did not exist would not violate the statute. "[O]bstruction can only arise when justice is being administered." *Id.*, at 207. See, *e. g., United States* v. *Williams*, 874 F. 2d 968, 977 (CA5 1989) ("There are three core elements that the government must establish . . . : (1) there must be a pending judicial proceeding").

Shorter Oxford English Dictionary 816 (1993). Thus, § 1503 reaches only *purposeful* efforts to obstruct the due administration of justice, *i. e.*, acts performed with that very object in mind. See, *e. g.*, *United States* v. *Mullins*, 22 F. 3d 1365, 1370 (CA6 1994); *United States* v. *Ryan*, 455 F. 2d 728, 734 (CA9 1972). This limitation was clearly set forth in our first decision construing § 1503's predecessor statute, *Pettibone* v. *United States*, 148 U. S. 197 (1893), which held an indictment insufficient because it had failed to allege the intent to obstruct justice. That opinion rejected the Government's contention that the intent required to violate the statute could be found in "the intent to commit an unlawful act, in the doing of which justice was in fact obstructed"; to justify a conviction, it said, "the specific intent to violate the statute must exist." *Id.*, at 207. *Pettibone* did acknowledge, however—and here is the point that is distorted to produce today's opinion—that the specific intent to obstruct justice could be found where the defendant intentionally committed a wrongful act that had obstruction of justice as its "natural and probable consequence." *Ibid.*

Today's "nexus" requirement sounds like this, but is in reality quite different. Instead of reaffirming that "natural and probable consequence" is one way of establishing intent, it *substitutes* "'"natural and probable effect"'" *for* intent, requiring that factor even when intent to obstruct justice is otherwise clear. See *ante*, at 599, quoting *United States* v. *Wood*, 6 F. 3d 692, 695 (CA10 1993), which in turn quotes *United States* v. *Thomas*, 916 F. 2d 647, 651 (CA11 1990).[2]

---

[2] *Thomas*, which appears to be the origin of this doctrine, made precisely the same mistake the Court does. It cited and misapplied earlier Court of Appeals cases standing for the entirely different principle—flowing from our language in *Pettibone*—that to prove an "endeavor" to obstruct justice, "all the government has to establish is that the defendant should have reasonably foreseen that the natural and probable consequence of the success of his scheme would [obstruct the due administration of justice]." *United States* v. *Silverman*, 745 F. 2d 1386, 1393 (CA11 1984). See also *United States* v. *Fields*, 838 F. 2d 1571, 1573 (CA11 1988). This

But while it is quite proper to derive an *intent* requirement from § 1503's use of the word "endeavor," it is quite impossible to derive a *"natural and probable consequence"* requirement. One would be "endeavoring" to obstruct justice if he intentionally set out to do it by means that would only unnaturally and improbably be successful. As we said in *Russell,* "any effort or essay" corruptly to influence, obstruct, or impede the due administration of justice constitutes a forbidden endeavor, 255 U. S., at 143, even, as we held in *Osborn,* an effort that is *incapable* of having that effect, see 385 U. S., at 333.

The Court does not indicate where its "nexus" requirement is to be found in the words of the statute. Instead, it justifies its holding with the assertion that "[w]e have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress and out of concern that a fair warning should be given . . . of what the law intends to do if a certain line is passed." *Ante,* at 600 (citation and internal quotation marks omitted). But "exercising restraint *in assessing the reach* of a federal criminal statute" (which is what the rule of lenity requires, see *United States* v. *Bass,* 404 U. S. 336, 347–348 (1971)) is quite different from importing extratextual requirements *in order to limit the reach* of a federal criminal statute, which is what the Court has done here. By limiting § 1503 to acts having the "natural and probable effect" of interfering with the due administration of justice, the Court effectively reads the word "endeavor," which we said in *Russell* embraced "any effort or essay" to obstruct justice, 255 U. S., at 143, out of the omnibus clause, leaving a prohibition of only actual obstruction and competent attempts.

---

does not impose a requirement of "natural and probable consequence," but approves a manner of proof of "intent." See, *e. g., United States* v. *Neiswender,* 590 F. 2d 1269, 1273 (CA4), cert. denied, 441 U. S. 963 (1979).

## II

The Court apparently adds to its "natural and probable effect" requirement the requirement that the defendant *know* of that natural and probable effect.  See *ante*, at 599 ("[I]f the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct").  Separate proof of such knowledge is not, I think, required for the orthodox use of the "natural and probable effect" rule discussed in *Pettibone:* Where the defendant intentionally commits a wrongful act that *in fact* has the "natural and probable consequence" of obstructing justice, "the unintended wrong may derive its character from the wrong that was intended."  148 U. S., at 207.  Or, as we would put the point in modern times, the jury is entitled to presume that a person intends the natural and probable consequences of his acts.

While inquiry into the state of the defendant's knowledge seems quite superfluous to the Court's opinion (since the act performed did not have the requisite "natural and probable effect" anyway), it is necessary to my disposition of the case.  As I have said, I think an act committed *with intent to obstruct* is all that matters; and what one can fairly be thought to have intended depends in part upon what one can fairly be thought to have known.  The critical point of knowledge at issue, in my view, is not whether "respondent knew that his false statement *would be provided* to the grand jury," *ante*, at 601 (emphasis added) (a heightened burden imposed by the Court's knowledge-of-natural-and-probable-effect requirement), but rather whether respondent knew—or indeed, even erroneously *believed*—that his false statement *might* be provided to the grand jury (which is all the knowledge needed to support the conclusion that the purpose of his lie was to mislead the jury).  Applying the familiar standard of *Jackson* v. *Virginia,* 443 U. S. 307 (1979), to the proper question, I find that a rational juror could readily

have concluded beyond a reasonable doubt that respondent had corruptly endeavored to impede the due administration of justice, i. e., that he lied to the FBI agents intending to interfere with a grand jury investigation into his misdeeds.

Recorded conversations established that respondent knew a grand jury had been convened, App. 47; that he had been told he was a target of its investigation, id., at 68; and that he feared he would be unable to explain his actions if he were subpoenaed to testify, id., at 51. Respondent himself testified that, at least at the conclusion of the interview, it was his "impression" that his statements to the FBI agents would be reported to the grand jury. 9 Tr. 1360 (Aug. 14, 1990). The evidence further established that respondent made false statements to the FBI agents that minimized his involvement in the matters the grand jury was investigating. See App. 73, 76, 81, 83–84, 86. Viewing this evidence in the light most favorable to the Government, I am simply unable to conclude that no rational trier of fact could have found beyond a reasonable doubt that respondent lied specifically because he thought the agents *might* convey what he said to the grand jury—which suffices to constitute a corrupt endeavor to impede the due administration of justice. In fact, I think it would be hard for a juror to conclude otherwise.

## III

Since I find against respondent on the § 1503 count, I must consider several other grounds offered by respondent for affirming the Court of Appeals' setting aside of his conviction. First, invoking the interpretive canon of *ejusdem generis*, he argues that, since all the rest of § 1503 refers only to actions directed at jurors and court officers,[3] the omnibus clause can-

---

[3] Those clauses provide:

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any

not apply to actions directed at witnesses. But the rule of *ejusdem generis*, which "limits general terms which follow specific ones to matters similar to those specified," *Gooch* v. *United States*, 297 U. S. 124, 128 (1936); accord, *Harrison* v. *PPG Industries, Inc.*, 446 U. S. 578, 588 (1980), has no application here. Although something of a catchall, the omnibus clause is *not* a general or collective term following a list of specific items to which a particular statutory command is applicable (*e. g.*, "fishing rods, nets, hooks, bobbers, sinkers, and other equipment"). Rather, it is one of the several distinct and independent prohibitions contained in § 1503 that share only the word "Whoever," which begins the statute, and the penalty provision which ends it. Indeed, given the already broad terms of the other clauses in § 1503, to limit the omnibus clause in the manner respondent urges would render it superfluous. See *United States* v. *Howard*, 569 F. 2d 1331, 1333 (CA5 1978).

Respondent next contends that because Congress in 1982 enacted a different statute, 18 U. S. C. § 1512, dealing with witness tampering, and simultaneously removed from § 1503 the provisions it had previously contained specifically addressing efforts to influence or injure witnesses, see Victim and Witness Protection Act of 1982, Pub. L. 97–291, 96 Stat. 1249–1250, 1253, his witness-related conduct is no longer punishable under the omnibus clause of § 1503. The 1982 amendment, however, did nothing to alter the omnibus clause, which by its terms encompasses corrupt "endeavors to influence, obstruct, or impede, the due administration of

United States commissioner or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties . . . shall be fined not more than $5,000 or imprisoned not more than five years, or both." 18 U. S. C. § 1503.

justice." The fact that there is now some overlap between § 1503 and § 1512 is no more intolerable than the fact that there is some overlap between the omnibus clause of § 1503 and the other provisions of § 1503 itself. It hardly leads to the conclusion that § 1503 was, to the extent of the overlap, silently repealed. It is not unusual for a particular act to violate more than one criminal statute, see, *e. g., Gavieres* v. *United States,* 220 U. S. 338, 342 (1911), and in such situations the Government may proceed under any statute that applies, see, *e. g., United States* v. *Batchelder,* 442 U. S. 114, 123–124 (1979); *United States* v. *Beacon Brass Co.,* 344 U. S. 43, 45–46 (1952). It is, moreover, "a cardinal principle of statutory construction that repeals by implication are not favored." *United States* v. *United Continental Tuna Corp.,* 425 U. S. 164, 168 (1976); see also *Posadas* v. *National City Bank,* 296 U. S. 497, 503 (1936).

Finally, respondent posits that the phrase " 'corruptly . . . endeavors to influence, obstruct, or impede' may be unconstitutionally vague," in that it fails to provide sufficient notice that lying to potential grand jury witnesses in an effort to thwart a grand jury investigation is proscribed. Brief for Respondent 22, n. 13. Statutory language need not be colloquial, however, and the term "corruptly" in criminal laws has a longstanding and well-accepted meaning. It denotes "[a]n act done with an intent to give some advantage inconsistent with official duty and the rights of others. . . . It includes bribery but is more comprehensive; because an act may be corruptly done though the advantage to be derived from it be not offered by another." *United States* v. *Ogle,* 613 F. 2d 233, 238 (CA10) (internal quotation marks omitted), cert. denied, 449 U. S. 825 (1980). See also Ballentine's Law Dictionary 276 (3d ed. 1969); Black's Law Dictionary 345 (6th ed. 1990). As the District Court here instructed the jury:

> "An act is done corruptly if it's done voluntarily and intentionally to bring about either an unlawful result or a lawful result by some unlawful method, with a hope or

expectation of either financial gain or other benefit to oneself or a benefit of another person." App. 117.

Moreover, in the context of obstructing jury proceedings, any claim of ignorance of wrongdoing is incredible. Acts specifically intended to "influence, obstruct, or impede, the due administration of justice" are obviously wrongful, just as they are necessarily "corrupt." See *Ogle, supra,* at 239; *United States* v. *North,* 910 F. 2d 843, 941 (CADC) (Silberman, J., concurring in part and dissenting in part), modified, 920 F. 2d 940 (1990); *United States* v. *Reeves,* 752 F. 2d 995, 999 (CA5), cert. denied, 474 U. S. 834 (1985).

\*     \*     \*

The "nexus" requirement that the Court today engrafts into § 1503 has no basis in the words Congress enacted. I would reverse that part of the Court of Appeals' judgment which set aside respondent's conviction under that statute.