**UNITED STATES of America,
Appellee,**

v.

**JACQUES DESSANGE, INC.; Libby Salberg, Defendants,**

**Howard David Deutsch, Defendant–Appellant.**

No. 00–1486.

United States Court of Appeals, Second Circuit.

Feb. 16, 2001.

Peter G. Neiman, New York, NY, Assistant United States Attorney for the Southern District of New York; Mary Jo White, United States Attorney for the Southern District of New York, George Canellos, Assistant United States Attorney, on the brief, for appellee.

Nathan Lewin, Washington, DC, Miller, Cassidy, Larroca & Lewin, L.L.P., for appellant.

Present McLAUGHLIN, JACOBS and SOTOMAYOR, Circuit Judges.

## SUMMARY ORDER

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of the district court be, and it hereby is, AFFIRMED.

Defendant Howard David Deutsch was convicted by a jury on April 20, 2000 in the United States District Court for the Southern District of New York (Cote, Judge) of conspiracy to submit false visa applications to the INS, conspiracy to obstruct justice, obstructing an INS investigation, and witness tampering. Deutsch was sentenced to 37 months in jail and ordered to pay a $7,500 fine.

Deutsch argues on appeal that the evidence at trial was insufficient to support his convictions under the federal witness tampering and obstruction statutes, 18 U.S.C. §§ 1512(b) & 1505. He further argues that if those convictions are reversed, the two remaining conspiracy charges must also be dismissed, and, in

any event, that he is entitled to a new trial because he should have been tried separately from his corporate co-defendant. Finding no merit in Deutsch's contentions, we affirm.

### I.

Except as provided below, familiarity with the facts of this case is assumed. Deutsch was the senior partner in a New York immigration law firm bearing his name and the name of his junior partner, Libby Salberg. Between 1994 and October 1997, Deutsch, Salberg, and Jacques Dessange, Inc. ("JDI"), a New York subsidiary of a French company that owns or controls approximately 600 hair salons around the world, conspired to submit, and in fact submitted, more than thirty fraudulent visa applications to the Immigration and Naturalization Service ("INS").[1] The visa applications fraudulently sought L1–A visas for hairdressers that JDI brought to the United States to staff a nationwide chain of new hair salons. To satisfy the requirements for L1–A visas, the applications falsely represented that the applicants would hold management positions at JDI in New York.

In April 1996, the INS began a criminal investigation of JDI, which led to an October 1997 INS raid on a Dallas-based JDI franchisee, followed by the arrests of several hairdressers employed there. Shortly afterward, JDI asked Deutsch & Salberg to turn over all of its immigration files. JDI made this request through Yves Anthonioz, its senior representative in the United States.

In May 1998, the month before Deutsch & Salberg returned the files to JDI,

---

1. Salberg pleaded guilty on January 24, 2000 to conspiring to submit fraudulent visa applications, submitting fraudulent visa applications, and conspiring to obstruct justice. JDI, Deutsch's co-defendant at trial, was convicted of multiple substantive counts of submitting fraudulent visa applications.

Deutsch removed certain incriminating documents from the client files and inserted certain exculpatory ones, which he fabricated. Three phoney handwritten letters bearing Deutsch's signature, and purportedly written over a two year period prior to the October 1997 Dallas raid, were addressed to Yves Anthonioz, and supplied innocent explanations for Deutsch's role in the submission of false visa applications—explanations that were keyed to the charges being investigated by the INS.

## II.

 Deutsch "bears a heavy burden" in seeking to overturn his witness tampering and obstruction of justice convictions based on insufficiency of the evidence. *United States v. Kinney*, 211 F.3d 13, 16 (2d Cir.2000) (citation omitted).

> When a defendant challenges the sufficiency of the evidence underlying his conviction, we review the evidence in the light most favorable to the government, drawing all possible inferences in favor of the prosecution.... The ultimate question is not whether we believe the evidence adduced at trial established defendant's guilt beyond a reasonable doubt but whether any rational trier of fact could so find.

*United States v. Payton*, 159 F.3d 49, 55–56 (2d Cir.1998).

### 1. *Witness Tampering*

 Title 18, U.S.C. § 1512(b) provides, in relevant part:

> Whoever knowingly ... engages in misleading conduct towards another person, with intent to—
>
> > (1) influence, delay, or prevent the testimony of any person in an official proceeding; ... [or]
> >
> > \* \* \*

> > (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission ... of a Federal offense [shall be guilty of a crime].

Deutsch argues that he could not have engaged in "misleading conduct" towards Anthonioz because Anthonioz, with whom Deutsch had dealt throughout his firm's representation of JDI, knew that the backdated, handwritten letters were fake.

The government identified JDI, not Anthonioz, as the witness with whom Deutsch tampered. The jury could reasonably have concluded that Deutsch submitted the phoney letters to JDI with the intent of influencing JDI's future grand jury testimony or communications to federal investigators. *See United States v. Gabriel*, 125 F.3d 89, 103 (2d Cir.1997) ("[T]he government was required to prove only that [the defendant] endeavored corruptly to persuade or mislead [the witness] with the intent of influencing [the witness's] potential testimony before a grand jury."). Even if *Anthonioz* may not have been deceived into thinking he had actually received the phoney letters, *JDI* could have been tricked into believing that the letters were real. Deutsch could expect that JDI would act through counsel in producing documents or in response to official inquiry, and that JDI, acting through its criminal defense attorney, would not realize that documents in the file of the client's lawyer were fabricated. This is precisely the theory that the government advanced (and the jury evidently accepted) during its closing argument:

> [T]here was a reasonable possibility that [Deutsch's] efforts to mislead Dessange to thinking he [Deutsch] actually sent those letters to Yves Anthonioz might work ... By making them and pawning off the documents to Jacques Dessange,

Deutsch intended to trick the corporation into thinking that the documents were real so that in the event the corporation was subpoenaed, that is, asked to testify, they would produce those documents as actual documents they received.

This possibility—that JDI could have been fooled into thinking that Deutsch's phoney letters were real—distinguishes this case from *United States v. King,* 762 F.2d 232 (2d Cir.1985), where we held that an attempt by an accused to persuade a witness to lie in order to mislead the government is not an offense under § 1512(b). Deutsch never asked JDI (or, for that matter, Anthonioz) to say something they knew to be false. Rather, he fabricated exculpatory letters and inserted them in his client's file as if they were genuine documents. The jury could reasonably have found that Deutsch engaged in this conduct with the intent to influence JDI's potential testimony or future interactions with law enforcement.

### 2. *Obstruction of Justice*

The federal obstruction of justice statute makes it unlawful to "corruptly ... influence[], obstruct[], or impede[], or endeavor[] to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States." 18 U.S.C. § 1505. Deutsch argues that the evidence adduced at trial cannot support a violation under this statute because (A) there was no "pending proceeding" at the relevant time, and (B) there was, in any event, no "nexus" between Deutsch's misconduct and future testimony before an official body, a nexus required by the Supreme Court under a similarly-worded statute in *United States v. Aguilar,* 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995) (applying

nexus requirement to 18 U.S.C. § 1503— "Influencing or injuring officer or juror generally").

### A. *Pending Proceeding*

■ In October 1997, before the documents were fabricated and planted, the INS had raided the Dallas salon, and arrested several of the hairdressers, as Deutsch knew. The jury therefore could conclude that the INS criminal investigation into JDI constituted a "pending proceeding" at the time Deutsch forwarded the forged documents to JDI. The term "proceeding" in § 1505 is defined broadly. *See United States v. Schwartz,* 924 F.2d 410, 423 (2d Cir.1991) (Custom Service's interview qualifies as a "proceeding" under § 1505). This Circuit has not recognized a distinction proposed by Deutsch between "initial steps" and a "plenary investigation," and the one circuit case Deutsch cites for this distinction actually supports the government. *See United States v.. Kelley,* 36 F.3d 1118, 1127 (D.C.Cir.1994) ("[T]he Inspector General's inquiries, albeit preliminary, constitute a 'proceeding' within the meaning of § 1505.").

### B. *Nexus*

■ In *United States v. Aguilar,* 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995), the Supreme Court examined the general obstruction statute, 28 U.S.C. § 1503, and ruled that the statute contained a nexus element, which is satisfied when the obstructive conduct has some "relationship in time, causation or logic" to a judicial proceeding, so that it may be said to have a " 'natural and probable effect' of interfering with the due administration of justice." *Id.* at 599, 601, 115 S.Ct. 2357. Assuming that the nexus requirement announced in *Aguilar* applies to § 1505 prosecutions, the jury could reasonably conclude that it was satisfied here.

64

Unlike Aguilar, Deutsch did not merely "utter[ ] false statements to an investigating agent ... who might or might not testify before a grand jury." *Id.* at 600, 115 S.Ct. 2357. Rather, he supplied altered and fabricated documents to an entity which he knew (i) was a target of an INS investigation, and (ii) had already faced questioning by INS agents, arrests of its employees by INS agents, and raids of its facilities by INS agents. As Deutsch emphasizes, the INS never ended up requesting the altered files. But that does not matter because § 1505 "makes conduct punishable where the defendant acts with an intent to obstruct justice, and in a manner that is likely to obstruct justice...." *Id.* at 601–02, 115 S.Ct. 2357. Whatever in fact transpired, the jury was entitled to find that Deutsch *intended* that his actions would affect the INS investigation. *See id.* at 601–02, 115 S.Ct. 2357 (Section § 1503 "makes conduct punishable where the defendant acts with an intent to obstruct justice, ... but is foiled in some way.").

### III.

#### 1. *Conspiracy to Obstruct Justice/Visa Fraud Conviction*

We do not address Deutsch's arguments with respect to the conspiracy charges because they are premised on the success of his challenge to the witness tampering and obstruction convictions.

#### 2. *Severance*

█ Deutsch argues that he should be afforded a new trial because, at trial, JDI was pursuing a defense-advice of counsel—that was antagonistic to the defense mounted by Deutsch.

In *Zafiro v. United States*, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), the Supreme Court held that severance should be granted "only if there is a serious risk that a joint trial would [1] compromise a specific trial right of one of the defendants," such as the right to cross-examine witnesses, or "[2] prevent the jury from making a reliable judgment about guilt or innocence," such as when one co-defendant is deprived of exculpatory evidence that would otherwise be available. *Id.* at 539, 113 S.Ct. 933. Otherwise, the Court held, mutually antagonistic defenses do not mandate severance. *See id.* at 538, 113 S.Ct. 933.

Here, the asserted error was that Deutsch was left at trial "to defend himself against two prosecutors—not only the government's lawyer, but also counsel for his corporate co-defendant." But the defenses of Deutsch and JDI were *not* irreconcilable. The jury could have concluded both (i) that JDI relied on erroneous advice from Deutsch's law partner Libby Salberg, and (ii) that Deutsch was not personally involved in rendering that legal advice. True, there was some antagonism between the defenses of Deutsch and JDI in opening statements; but by the end of the trial, both defendants relied upon the same core theory—each blamed Salberg alone for the visa fraud.

For the reasons set forth above, the judgment of the district court is hereby AFFIRMED.