[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 31, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-11271
Non-Argument Calendar

_____

D. C. Docket No. 03-80009-CR-DTKH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

NICHOLAS DeANGELIS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(October 31, 2006)**

Before PRYOR, FAY and REAVLEY,* Circuit Judges.

PER CURIAM:

---

* Honorable Thomas M. Reavley, United States Circuit Judge for the Fifth Circuit,
sitting by designation.

Nicholas DeAngelis appeals his convictions and sentences for 51 counts of conspiracy, wire fraud, mail fraud, money laundering, obstruction of justice, perjury, tax evasion, and identity theft offenses committed in the course of directing a fraudulent investment scheme. DeAngelis argues that the evidence was insufficient to support each of his convictions and that the district court erred in its application of the advisory Sentencing Guidelines. We affirm.

## I. BACKGROUND

At trial, the government presented evidence that, from 2000 to 2002, DeAngelis used the interstate wires and mails to solicit and obtain $1.5 million from 17 investors in his Velvet Hammer Consulting Group and GIASI ("Godly Inspired and Spiritually Invincible" or "God Is Always Sitting In") group of companies. DeAngelis represented to the investors that these companies were in the business of bridge financing, currency trading, pain clinic management, or charitable works. He represented that some investments were loans to the company that would be repaid with interest, others were purchases of ownership in the companies, and others would be exchanged for stock when GIASI made its initial public offering.

Velvet Hammer never issued any bridge loans, no investments were ever made in pain clinics or charities, and GIASI never went public. The investors'

funds were spent on expensive automobiles, clothing, and watches; personal expenses of DeAngelis and his associates, including mortgage and utility payments; and Ponzi payments to the investors. DeAngelis used an elaborate system of corporate shells, nominees, and checks negotiated at check cashing stores to launder the funds and evade taxation, and DeAngelis opened power, telephone, and cable accounts at his residence in the name of Gyonki Berki.

In 2001, DeAngelis was arrested for attempted tax evasion in a separate fraudulent investment scheme in which he had been involved from 1993 through 1995. Before his first appearance in that matter, he gave false information about his assets to the pretrial services officer who made a bond recommendation to the court. DeAngelis pleaded guilty, and in March 2002 he was sentenced to 30 months in prison. During the presentence investigation, DeAngelis gave false information about his assets to a probation officer. On his way to prison, DeAngelis instructed his attorney to reassure his investors.

After investors complained, the FBI and IRS investigated DeAngelis's activities. A grand jury returned a second superseding indictment on 51 counts: conspiracy to commit mail fraud, wire fraud, and interstate transportation of property taken by fraud (Count 1); wire fraud (Counts 2 through 10); mail fraud (Counts 11 through 17); transportation of stolen property and money (Counts 18

3

through 21); conspiracy to commit money laundering activity (Count 22); money laundering (promotion) (Counts 23 through 30); money laundering (concealing) (Counts 31 through 40); monetary transactions with criminally derived property (Counts 41 through 43); obstruction of justice (Counts 44 through 46); perjury (Count 47); conspiracy to impair and impede the IRS (Count 48); evasion of payment (Counts 49 and 50); and identity theft (Count 51). At trial, the closing argument of the attorney for DeAngelis described the investors as trusting souls who made rash investment decisions and DeAngelis as an inept but honest businessman who never intended to defraud anyone. The jury convicted DeAngelis on all 51 counts.

The Presentence Investigation Report recommended enhancements for amount of loss, number of victims, sophisticated means, money laundering, commission while on bond, leader-organizer role, and obstruction of justice, resulting in an offense level of 37. The PSI assigned three criminal history points for DeAngelis's attempted tax evasion guilty plea, United States Sentencing Guidelines § 4A1.1(a), and added two points for commission of the present offense within two years of release from custody, U.S.S.G. § 4A1.1(e), which resulted in a criminal history category of III and a Guideline range of 262 to 327 months. The court granted a departure to criminal history category IV, which corresponded to a

4

Guildeline range of 292 to 365 months.  The court imposed a sentence of 300 months.

## II. STANDARDS OF REVIEW

The following standards of review govern this appeal.  We review challenges to the sufficiency of the evidence de novo.  United States v. Keller, 916 F.2d 628, 632 (11th Cir. 1990).  We view the evidence "in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor" to determine whether a reasonable jury could conclude that the evidence establishes guilt beyond a reasonable doubt.  Id.  We review a sentence for Sixth Amendment violations de novo.  United States v. Paz, 405 F.3d 946, 948 (11th Cir. 2005).  We review the application of the Sentencing Guidelines to the facts de novo and the underlying factual findings for clear error.  United States v. Ellis, 419 F.3d 1189, 1192 (11th Cir. 2005).  We review the application of section 4A1.2 and section 1B1.3(a)(1) of the Guidelines to the facts for clear error.  United States v. White, 335 F.3d 1314, 1319 (11th Cir. 2003).  We review an upward departure under section 4A1.3 for abuse of discretion.  United States v. Hernandez, 160 F.3d 661, 668 (11th Cir. 1998).

## III. DISCUSSION

Our discussion of the issues is divided into two parts.  First, we review the issues about the sufficiency of the evidence.  Next, we review the issues about sentencing.

### A. Sufficiency of the Evidence

DeAngelis raises arguments about 50 of his convictions.  All fail.  We group the counts where DeAngelis raises a common argument about them and discuss each set of counts in turn.

### 1. Conspiracy (Count 1)

DeAngelis raises two arguments against the conspiracy count.  First, he argues that the conspiracy was a "rimless wheel" of multiple conspiracies rather than one single enterprise.  "Where the 'spokes' of a conspiracy have no knowledge of or connection with any other, dealing independently with the hub conspirator, there is not a single conspiracy, but rather as many conspiracies as there are spokes."  United States v. Chandler, 388 F.3d 796, 807-08 (11th Cir. 2004).  To support a conviction for a single conspiracy, the evidence must prove that the conspirators "knew of the 'essential nature of the plan' and agreed to it."  Id. at 806.

Viewed in the light most favorable to the government, the evidence was sufficient to support a conviction for a single conspiracy. Evidence presented at trial showed that DeAngelis's coconspirators, Robert Jabbour and Lou Claps, solicited and guaranteed others' investments with DeAngelis by making false representations of their own successes with him. Jabbour and DeAngelis agreed to use Claps's name on the corporate papers of the pain clinic. The coconspirators knew of each other and of the essential nature of the plan.

Second, DeAngelis argues that he did not agree to engage in conduct plainly proscribed by statute. The legal basis for this argument relies entirely upon language in <u>Chandler</u> that we later rescinded. <u>See</u> <u>Chandler</u>, 376 F.3d 1303, 1312-14 (11th Cir. 2004), <u>rescinded</u>, 388 F.3d at 798, 804-05. This argument fails.

### 2. Fraud (Counts 2 through 43)

DeAngelis argues that the evidence was insufficient to support his conviction on most of the remaining counts because the government failed to prove the existence of fraud, which is an element of each of the offenses challenged here. Under the wire fraud statute, 18 U.S.C. § 1343, "[a] scheme to defraud requires proof of material representations, or the omission or concealment of material facts." <u>Hasson</u>, 333 F.3d at 1270-71. The "scheme or artifice to defraud" language in the mail fraud and wire fraud statutes are construed identically. <u>Id.</u> at 1271 n.7.

7

Fraud is also an element of transportation of stolen property, 18 U.S.C. § 2314; and "[m]ail and wire fraud constitute 'specified unlawful activity' under the [money laundering] statutes." Hasson, 333 F.3d at 1274.

The evidence supports the charges that DeAngelis defrauded his investors. The investors testified that DeAngelis represented to them that he would use their money to make bridge loans, purchase pain clinics, finance real estate ventures, or buy shares in GIASI when it made its initial public offering. DeAngelis never used the investors' money for these purposes. The investors' funds were spent on clothing, automobiles, personal expenses of DeAngelis and his associates, and Ponzi payments to the investors. Only one payment was ever made to a pain clinic, and that check was dishonored. The director of the clinic testified that none of its funds came from GIASI or Velvet Hammer. DeAngelis produced financial statements that misrepresented the financial condition of his companies, and DeAngelis falsely represented himself as Greg Brown, both over the phone and in person. Another investor testified that he received false mortgage notes from DeAngelis as a security for his investment. Several investors testified that DeAngelis did not tell them that he was going to prison, where he could not conduct business, and they would not have invested with him if they had known

8

about his incarceration. Viewed in the light most favorable to the government, the evidence supports the charges that DeAngelis engaged in a scheme to defraud.

### 3. Obstruction of Justice (Counts 44 and 45)

DeAngelis argues that the pretrial services officer to whom he gave false statements was an investigating agent beyond the reach of the obstruction of justice statute. 18 U.S.C. § 1503; United States v. Aguilar, 515 U.S. 593, 600, 115 S. Ct. 2357, 2362 (1995). We disagree. We have explained that the critical element, under section 1503, is a nexus "in time, causation, or logic" between the obstructive act and the judicial proceeding. United States v. Vaghela, 169 F.3d 729, 733 (11th Cir. 1999). We must consider whether the defendant's actions "would have 'the natural and probable effect of interfering with the due administration of justice' in a way that is more than merely 'speculative.'" Id. at 734 (quoting Aguilar, 515 U.S. at 601, 115 S. Ct. at 2363). The issue then is whether a bond hearing is a "judicial proceeding" for the purposes of section 1503.

Because of its constitutional importance and the degree of judicial involvement, the bail proceeding is part of the "administration of justice" within the meaning of section 1503. Our precedent established long ago that "a bail hearing is a judicial proceeding," as opposed to an administrative or "housekeeping" proceeding, for the purposes of 18 U.S.C. § 1001, which

9

proscribes making materially false statements to agents of the government except in judicial proceedings. United States v. Abrahams, 604 F.2d 386, 393 (5th Cir. 1979). "The right to be free of excessive bail appears explicitly in the Bill of Rights. . . . Bail may be set only by a judicial officer. The determination of bail requires a judicial decision of which conditions of release will reasonably assure the appearance of a defendant." Id. The pretrial services officer testified that false information about one's income and assets submitted in the course of a bail investigation has a probable effect on the outcome of the bail proceeding, and DeAngelis does not dispute that his statements were false. The evidence was sufficient to support the convictions for obstruction of justice.

## 4. Perjury (Count 47)

DeAngelis argues that the false statement to the pretrial services officer was not material because it did not affect his bond determination. The perjury statute proscribes "willfully subscrib[ing] as true any material matter . . . not believe[d] to be true" in "any declaration, certificate, verification, or statement under penalty of perjury." 18 U.S.C. § 1621(2). A statement is material if it is "capable of influencing the tribunal on the issue before it." United States v. Forrest, 623 F.2d 1107, 1112 (5th Cir. 1978).

10

This argument fails. At trial, government witnesses testified that the false report of DeAngelis's assets could influence the court's decision on the measure of fine or restitution to impose. The evidence was sufficient to support the conclusion that the false statement, which DeAngelis subscribed as true and executed under penalty of perjury, was material.

### 5. Tax Evasion (Counts 48 through 50)

DeAngelis argues that the government failed to prove any of the three elements of tax evasion, 26 U.S.C. § 7201: "(1) wilfullness; (2) existence of a tax deficiency; and (3) an affirmative act constituting an evasion or attempted evasion of the tax." United States v. Kaiser, 893 F.2d 1300, 1305 (11th Cir. 1990). We disagree. First, DeAngelis argues that the government failed to prove that he knew he had an obligation to pay the taxes in question, but the evidence at trial established that DeAngelis possessed W-2s, completed tax returns, and a notice from the IRS, all of which provided notice of outstanding tax liabilities. Second, DeAngelis argues that he had no personal interest in the funds for which he evaded taxation, but DeAngelis's 2001 tax return listed $1.3 million in personal income, nearly the amount he received from GIASI investors that year. None of the companies with which DeAngelis was involved filed income taxes that year, which evidenced that he viewed those funds as his income. Third, DeAngelis argues that

11

he did not conceal anything from the IRS, but the evidence established that DeAngelis used nominees and kept his name off corporate documents and bank accounts, which, viewed in the light most favorable to the government, supports the tax evasion conviction and the conviction for conspiracy to evade taxation.

### 6. Identity Theft (Count 51)

DeAngelis argues that he did not know Gyonki Berki, he had no access to her identity particulars, and he had no intent to aid or abet any unlawful activity. Identity theft occurs when one "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law . . . ." 18 U.S.C. § 1028(a)(7). DeAngelis's argument fails.

At trial, the government presented circumstantial evidence that DeAngelis had access to Berki's identity documents through Jabbour, and the existence of the accounts in Berki's name supports the finding that DeAngelis had access to Berki's identification to open the accounts. DeAngelis's unlawful activity was tax evasion, and the use of another's identity to conceal DeAngelis's accounts is circumstantial evidence that DeAngelis sought to conceal his ability to make payments to the IRS.

12

Viewed in the light most favorable to the government, the evidence supports the conviction for identity theft.

*B. Sentencing*

DeAngelis raises two kinds of arguments about sentencing. DeAngelis first argues that all the enhancements not proved to a jury violated his Sixth Amendment rights. He next challenges two of the enhancements of his sentence and an upward departure on the grounds that the court erroneously applied the advisory Guidelines. All of his arguments fail.

1. Sixth Amendment Issues

DeAngelis erroneously contends that all the enhancements to his sentence were unlawful because they were based on judicial findings not proved to a jury beyond a reasonable doubt. The advisory use of the Guidelines does not implicate the Sixth Amendment. United States v. Booker, 543 U.S. 220, 233, 125 S. Ct. 738, 750 (2005). In Booker, "all nine [Justices] agreed that the use of extra-verdict enhancements in an advisory guidelines system is not unconstitutional." United States v. Rodriguez, 398 F.3d 1291, 1301 (11th Cir.), cert. denied, 545 U.S. 1127, 125 S. Ct. 2935 (2005). The district court properly understood Booker and applied the Guidelines as advisory. This argument fails.

## 2. Criminal History Points for Prior Sentence

DeAngelis argues that the criminal history assigned based on his 2001 conviction for attempted tax evasion was error. He contends that the 2001 conviction involved a "related case," not a "prior sentence," under section 4A1.2(a) of the Sentencing Guidelines. The pertinent inquiry is whether the 2001 conviction involved "conduct that is part of the instant offense," which means conduct that is relevant conduct to the instant offense under section 1B1.3 of the Guidelines. U.S.S.G. § 4A1.2, comment. n.1. Although DeAngelis repeatedly confuses this inquiry with the "related case" inquiry of section 4A1.2(a)(2), we construe his argument to be about the "relevant conduct to the instant offense."

DeAngelis argues that, because the indictment alleged his nonfiling of tax returns beginning in 1993, his earlier conviction for attempted tax evasion in 1994 involved conduct that is part of the instant offense. We disagree. At the sentencing hearing, the government conceded that the indictment and the PSI included the tax loss from 1993 to 1995, but argued that there was no overlapping conduct between the instant offense and DeAngelis's earlier conviction. It was not clear error for the district court to find that the instant offenses and the 1994 tax evasion were "separate and distinct crimes."

14

### 3. Criminal History Points for Commission While Incarcerated

DeAngelis's next argument is related to his previous argument. DeAngelis argues that if the 2001 conviction is not included in the criminal history under section 4A1.2(a)(1), it may not be used for the enhancement for commission of the instant offense while under a sentence under section 4A1.1(d). This argument fails, because we conclude that the 2001 conviction was properly included in the criminal history.

### 4. Criminal History Category Departure

DeAngelis argues that the departure from category III to category IV was an abuse of discretion based on "the subjective views of the district court." A court may depart upward "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(a)(1). The district court explained its reasons for granting the departure, which included the unprosecuted offenses that DeAngelis had committed and his lack of moral sensitivity in the commission of the instant offenses. The district court did not abuse its discretion.

15

**IV. CONCLUSION**

DeAngelis's convictions and sentences are

**AFFIRMED.**