NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0317n.06

Case No. 14-2003

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
May 01, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| MARCUS LITTLE, | ) | THE EASTERN DISTRICT OF |
| | ) | MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |
| | ) | OPINION |
| | ) | |

BEFORE: NORRIS, SUTTON, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** Defendant-Appellant Marcus Little ("Little") appeals his conviction and sentence for jury tampering. In 2013, a jury convicted Little of endeavoring to influence a juror in violation of 18 U.S.C. § 1503 and making a false statement to a government official in violation of 18 U.S.C. § 1001. The district court sentenced him to 34 months' imprisonment, to be followed by two years' supervised release. Little argues that there was insufficient evidence to support his conviction and that the district court abused its discretion in prohibiting gambling as a term of his supervised release. For the reasons that follow, we AFFIRM.

**I.**

In May and June of 2011, James Wiese ("Wiese"), Ilir Kikaj, and Tom Gjokaj were tried in federal court in Ann Arbor, Michigan, for conspiracy, bank fraud, wire fraud, money laundering, and aiding and abetting. During a break in the trial, on the evening of May 24, 2011, one of the jurors, Vernelle Gardner ("Gardner"), opened her front door to find a man on her doorstep. The man—later identified as Little—cordially introduced himself as "Miles" and addressed her by her first name. Little then became more serious, and told her that he was following the Wiese trial. Alarmed, Gardner told him to leave. Little became insistent, telling her, "I have some information I have to tell you. The Government's trying to steer you wrong." Little did not leave until Gardner's husband came to the door. Gardner immediately reported the incident to the police and court authorities. She was disqualified as a juror and replaced with an alternate. The trial against Wiese and his co-conspirators continued.

Meanwhile, federal agents began investigating the incident. As part of their efforts to identify Gardner's visitor, they reviewed Wiese's phone records. The records indicated that Wiese repeatedly had been in contact with a number registered to Hannah Little ("Hannah"). In early 2013, agents went to an address listed with the phone (the "Hannah Phone"), where they met Little. Little explained that Hannah was his daughter, and that the number corresponded to her phone from 2011. The agents asked Little why Hannah—a teenager—would have been in contact with Wiese. Little responded that he did not know, and that he did not know Wiese. Little called Hannah, who by that time was away at college, and handed the phone to one of the agents. Hannah told the agent that the number was her former number, and that no one else had used that phone.

After the call with Hannah, agents continued their discussion with Little. They asked him again about Wiese, and Little again denied knowing him. When Little asked what their investigation was about, the agents told him it related to a federal trial that had taken place in Ann Arbor. Little told them he had never been to a federal trial in Ann Arbor.

Later that day, the agents called Hannah without Little present. She admitted that the phone they had discussed earlier was actually used by her father, and that she had never used it. Further analysis on the Hannah Phone revealed that Little had significant contact with Wiese before and during Wiese's trial. Cell tower data indicated that Little had traveled roughly 16 miles from the Detroit metro area to the Ypsilanti area, where Gardner lived, on the evening of May 24, 2011.

Investigators later presented Gardner with a photo array, and she identified the image of Little in connection with the May 24 incident. Several court security officers ("CSOs") who screened visitors and oversaw security at the court house in Ann Arbor also confirmed having seen Little at the Wiese trial. The CSOs stated that, during the first part of the trial, Little consistently sat in the back of the courtroom and observed the proceedings. One of the officers even asked Little why he was attending so regularly. Little replied that he was there "to make sure the prosecution g[a]ve the[ defendants] a fair trial." Another officer later testified that unlike most observers at a trial, Little "never paid attention to what was going on in the courtroom[;] he just ke[pt] watching the jury." Despite his frequent attendance during the first part of the trial, none of the officers recalled seeing Little in court after the incident at Gardner's home. Three CSOs identified Little in a photo array, video footage from the court house lobby, or both.

The government brought charges against Little, and in September 2013, a jury convicted him of endeavoring to influence a juror and making a false statement to a government agent. The presentence investigation report ("PSR") submitted for sentencing indicated that Little had been unemployed in the three and a half years leading up to sentencing, that he gambled on a daily basis, and that he "most likely had some sort of gambling problem." The district court sentenced Little to 34 months' imprisonment and two years' supervised release, during which Little was prohibited from gambling or entering a gambling establishment, and was required to attend Gamblers Anonymous meetings. Little did not object to these conditions at sentencing.

## II.

On appeal, Little claims that there was insufficient evidence to sustain his conviction for endeavoring to influence a juror in violation of 18 U.S.C. § 1503.[1] He also claims that the district court abused its discretion when it incorporated a prohibition on gambling into the terms of his supervised release. Neither of these arguments is persuasive.

## A.

Little first argues that the prosecution failed to present sufficient evidence that he had the necessary intent to influence a juror as defined by the statute. We review de novo a defendant's claim of insufficient evidence. *United States v. Wright*, 774 F.3d 1085, 1088 (6th Cir. 2014). "The question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (internal quotation marks omitted)); *see also United States v. Siemaszko*, 612 F.3d 450, 462 (6th Cir. 2010)). "We may rely upon circumstantial evidence alone to support the jury verdict, but we

---

[1]Little does not challenge his conviction for making a false statement under 18 U.S.C. § 1001.

may not substitute our judgment for that of the jury." *United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014) (citing *United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005); *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993) (internal citations omitted). Reversal is appropriate "only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence." *Wright*, 774 F.3d at 1088 (quoting *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991) (internal quotation marks omitted)). Therefore, a defendant challenging his conviction on this basis "bears a very heavy burden." *Id.* (citing *United States v. Prince*, 214 F.3d 740, 746 (6th Cir. 2000)).

As discussed, Little was convicted of endeavoring to influence a juror under 18 U.S.C. § 1503. Section 1503 provides, in relevant part:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror [in] any court of the United States . . . in the discharge of his duty . . . shall be punished as provided[.]

18 U.S.C. § 1503.

To convict a defendant under § 1503, the prosecution must prove that "(1) there was a judicial proceeding; (2) the defendant had knowledge or notice of the pending proceeding; and (3) the defendant acted corruptly with the intent of influencing, obstructing, or impeding the proceeding in the due administration of justice." *United States v. Woodman*, No. 98-4527, 2000 WL 1234328, at *7 (6th Cir. Aug. 21, 2000) (citing *United States v. Collis*, 128 F.3d 313 (6th Cir. 1997)). Little does not dispute that there was a federal trial or that he attended it. Nor does he deny that he showed up, uninvited, on Gardner's doorstep on the evening of May 24, 2011, and expressed his desire to discuss the case on which she was a juror. Instead, Little bases his

appeal on the third element: Little insists that he acted "without evil intent"—that is, that his actions were not "corrupt," as required by the statute.

The Supreme Court established twenty years ago that a § 1503 conviction requires a showing that the defendant acted "with an intent to influence judicial or grand jury proceedings." *United States v. Aguilar*, 515 U.S. 593, 599 (1995) (citing *United States v. Brown*, 688 F.2d 596, 598 (9th Cir. 1982)). The prosecution makes this showing when it establishes a "nexus" between the defendant's act and the judicial proceeding in "time, causation, or logic." *Id.* (citing *United States v. Wood*, 6 F.3d 692, 696 (10th Cir. 1993); *United States v. Walasek*, 527 F.2d 676, 679, and n. 12 (3d Cir. 1975)). In other words, existence of this nexus demonstrates that the defendant knew his action would have "the natural and probable effect of interfering with the due administration of justice." *Id.* (quoting *Wood*, 6 F.3d at 695; *United States v. Thomas*, 916 F.2d 647, 651 (11th Cir. 1990); *Walasek*, 527 F.2d at 679) (internal quotation marks omitted). The defendant's efforts to influence a juror need not be successful; the mere endeavor suffices. *Id.* (citing *United States v. Russell*, 255 U.S. 138, 143 (1921)).

Moreover, we have rejected the notion that a defendant must express the specific intent to obstruct justice to be convicted under § 1503. *Woodman*, 2000 WL 1234328 at *7 (explaining that the defendant's "actions need only have the natural and probable effect of impeding justice. . . . An explicit specific intent to obstruct, therefore, is not necessary for conviction.)". *Id.* Rather, we can discern a defendant's malicious intent under § 1503 by examining the context and nature of his act, not merely from whether he openly acted with malicious intent. *See Aguilar*, 515 U.S. at 599; *Pettibone v. United States*, 148 U.S. 197, 207 (1893).

In this case, the government presented ample evidence that Little "undert[ook] action from which an obstruction of justice was a reasonably foreseeable result." *Id.* Little attended the

federal trial in Ann Arbor regularly, and while there, he studied the jury rather than the actual proceedings. He explicitly told one of the CSOs that he was doing so "*to make sure* the prosecution g[a]ve the[ defendants] a fair trial," which suggests an inclination to influence the proceeding if he saw something amiss. Phone records revealed significant contact between the Hannah Phone and Wiese throughout the time of his trial, and Hannah Little testified that her father was the only one who used that phone. Cell tower data showed that, on the night Little approached Gardner, the phone had traveled from the Detroit metro area (where Little lived) to Gardner's Yspilanti neighborhood several miles away. Gardner and several CSOs identified Little in connection with the Wiese trial and the May 24 incident. After the attempt to discuss the trial with Gardner on May 24, Little ceased all contact with Wiese and did not return to the trial.

More compelling than these circumstances, however, is the nature of Little's act and its predictable consequences. Gardner's address was not a matter of public record regarding the Wiese case, and with good reason: a juror's ability to carry out her duties uninhibited by the prospect of retaliation is a cornerstone of our judicial system. Yet, Little somehow acquired her home address. He showed up unannounced and uninvited on her doorstep one evening, where he introduced himself under a fake name. Little addressed Gardner by her first name, and proceeded to tell her he wanted to discuss the trial on which she had been serving. When Gardner interrupted Little and told him to leave, he did not. Little persisted until she called her husband to the door. Predictably, Gardner felt intimidated. Ultimately, she was removed as a juror from the Wiese trial.

That Little says he had no "evil" intent to influence the Wiese trial is inapposite. He behaved in a manner that any reasonable person would believe had the power to influence the

outcome of the trial. Based on this record, we find that a rational jury could have found the essential elements of the crime under § 1503 beyond a reasonable doubt. The conviction stands.

**B.**

Little also challenges the terms of his supervised release, under which he is prohibited from gambling, may not enter a gambling establishment, and must attend Gambler's Anonymous meetings. Little argues that the district court abused its discretion when it imposed these restrictions because he is a professional gambler. In particular, he claims that we must reverse the district court because the gambling conditions in his sentence: 1) do not reasonably relate to his crime or rehabilitation under 18 U.S.C. § 3553; 2) deprive him of his livelihood in violation of his Fourteenth Amendment right to liberty; and 3) constitute an unconstitutional Bill of Attainder targeted solely at Little's "legitimate, legal, and even respectable profession."

As Little did not object to these conditions at sentencing, we review the district court's decision for plain error. *United States v. Dotson*, 715 F.3d 576, 583 (6th Cir. 2013) (citing *United States v. Inman*, 666 F.3d 1001, 1003 (6th Cir. 2012) (per curiam)). To demonstrate plain error, Little must establish that "(1) an error occurred; (2) the error was plain, that is, obvious or clear; (3) the error affected his substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id*. (citing *United States v. Lucas*, 640 F.3d 168, 173-74 (6th Cir. 2011)). Little fails to make this showing.

It is well-established that the district court may impose a condition on a defendant's supervised release "to the extent that such condition is reasonably related" to the sentencing factors contemplated in § 3553(a). 18 U.S.C. § 3583(d). These sentencing factors include the "history and characteristics of the defendant" as well as the obligation "to provide the defendant

with needed educational or vocational training, medical care, or *other correctional treatment* in the most effective manner[.]" 18 U.S.C. § 3553(a)(1), (2)(D) (emphasis added).

A review of the record reveals a solid basis for the court's imposition of the gambling ban in Little's case. At the time of sentencing in July 2014, Little was on probation for failure to pay over $25,000 in child support.[2] Little reported that he received some income from "poker[,]" but did not indicate gambling was his profession: the PSR states that Little was unemployed from February 2011 through 2014. The report also details Little's education (a Bachelor of Science in Business Marketing) and experience in various financial positions leading up to his period of unemployment.

The probation officer who prepared the PSR flagged Little's gambling as an issue impacting his mental and emotional health. During the presentence interview, Little stated that he wagered money playing poker on a nearly daily basis. When asked further about his gambling, Little responded that he "doesn't gamble; he plays poker" and stated that he did not have any problems with gambling "because 'he wins[.]'" To better assess this claim, the probation officer had Little complete a South Oaks Gambling Screen, and found that the "self-report tool indicat[ed] that [Little] most likely has some sort of gambling problem." Little told the officer that he had never considered his gambling a problem, had never attended a gambling treatment or support group, and did not feel he was in need of treatment or support at that time.

When it sentenced Little, the district court explicitly stated that it had considered the facts and circumstances of Little's crime, the § 3553 factors, and the information contained in the PSR. It then incorporated conditions—related not just to gambling, but also employment generally—to rehabilitate Little on his release:

---

[2]Little challenged this aspect of the PSR, but at his sentencing hearing, Little's counsel acknowledged that this payment was not legally excused at the time of sentencing.

> Due to the defendant's lack of employment history, defendant shall be lawfully and gainfully employed, participating in an educational vocational program or a combination thereof, which would be the equivalent of full-time employment. . . . Due to the defendant's history of gambling, defendant is prohibited from engaging in any gambling activity, . . . from entering the premises of any gambling casino or other place where gambling activity is conducted[,] . . . [and] shall participate in a program approved by the probation department for the treatment of gambling addiction.

While Little expounds at length on the legality of gambling and the existence of professional gamblers, he presents nothing to negate the court's implicit finding that, in his case, gambling is an affliction that may prevent his post-release rehabilitation. Little thus fails to demonstrate that the court's sentence was in error, let alone that its error was plain, impacted his substantial rights, or influenced the fairness of the proceedings on this claim.

Nor does Little establish plain error on any of a plethora of poorly-developed constitutional arguments. Little first relies on *United States v. Kingsley*, 241 F.3d 828 (6th Cir. 2001), for the proposition that he has a right to employment. But the connection between Little's circumstances and Kingsley's are minimal: in *Kingsley*, we upheld a condition of release prohibiting Kingsley's use of a motor vehicle in order to hinder future criminal activity and protect the public. 241 F.3d at 838. Little asserts that, because the gambling conditions do not relate to his crime of conviction or the public safety, they are invalid. However, nothing in *Kingsley* dictates that conclusion, and under the terms of § 3583, the court is not limited to imposing conditions only for public safety or prevention of future crimes—the court may consider all the § 3553 factors. As discussed, that is precisely what the court did here when it imposed a ban on gambling to aid Little's rehabilitation.[3]

---

[3]Little goes on to analogize part of our holding in *Kingsley*—that there exists no absolute right to drive a motor vehicle—to a holding that, by contrast, there is a right to employment. As he makes this leap without legal or logical support, we decline to address it further.

Little also claims that, because gambling constitutes his "entire livelihood," the court's ban on this activity for the term of his supervised release is an unconstitutional deprivation of his liberty.[4] However, to establish such a claim under the Constitution, Little must show more than a limitation of his options: "[a] charge that merely makes a plaintiff less attractive to other employers but leaves open a range of opportunity does not constitute a liberty deprivation." *Gregory v. Hunt*, 24 F.3d 781, 788 (6th Cir. 1994) (citing *Chilingirian v. Boris*, 882 F.2d 200, n.8 (6th Cir. 1989)). Even if Little can show that gambling was in fact his profession at the time of sentencing, he fails to explain how the court's conditions render him unable to rely on his education and experience to qualify for a range of positions unrelated to gambling. Accordingly, we find that he has not shown that the court committed plain error on these grounds.

### III.

For the foregoing reasons, we AFFIRM the decision of the district court.

---

[4]In another argument, Little claims that the ban on gambling during his period of supervised release constitutes a "bill of attainder" that seeks to punish professional gamblers—a legislative act prohibited under the Constitution. U.S. CONST. ART. I, § 9, cl. 3. As the matter at hand is not a legislative act and Little presents no foundation for this claim, we also decline to address this argument.