[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11342

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

WILLIAM RAYMOND BEACH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:18-cr-00293-WFJ-TGW-1

_____

Before LUCK, LAGOA, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

The setting for this case is a street community in Tampa, Florida, referred to by its inhabitants—mostly drug traffickers and the addicts they serve—as "the field." On November 13, 2017, Bradley Dykes, a heroin addict living in the field, was in dire need of an injection. He sent his girlfriend, Tanya Molish, a crack addict, to their supplier, Corey Donald Smith, for a fix. Dykes gave Molish his EBT card to pay for the drug. Using the card as payment, Molish bought the heroin from Smith and then injected Dykes with it. The heroin was laced with fentanyl. Dykes went into a coma and died with Molish at his side.

Detectives Robert Harrop and Ryan LaGasse of the Hillsborough County Sheriff's Office Heroin Working Group, which partnered with federal law enforcement, were soon on the case and located Molish. She admitted what had taken place on November 13, 2017, and agreed to help the detectives make a federal narcotics case against Smith via a controlled drug buy. This didn't sit well with Molish's new boyfriend, Appellant William Raymond Beach, who had a lengthy criminal record and was being held in the Hillsborough County Jail (the "Jail") on a charge of trespassing. In a monitored and recorded telephone call he made to Molish from the Jail on May 7, 2018, Beach threatened to kill her if she cooperated with law enforcement and participated in a controlled drug buy from Smith.

That death threat led to Beach's indictment and conviction for tampering with a witness in violation of 18 U.S.C.

§ 1512(a)(2)(A).[1]  Beach appeals his conviction on the ground that the evidence was insufficient to convict him of the offense in three respects: (1) the alleged threat of physical force only related to a criminal investigation, not an "official proceeding"; (2) the evidence failed to establish that he intended to prevent Molish from testifying in an official proceeding; and (3) the evidence failed to establish that he was the person who threatened Molish.  We are not persuaded.  Accordingly, we affirm Beach's conviction.

## I.

Beach's one-day jury trial occurred on December 17, 2018. The prosecution presented one witness, Detective Harrop, and four exhibits.  Exhibit 1, a recording of the phone call Beach made to Molish from the Jail at 7:37 P.M. on May 7, 2018, served as the foundation for the indictment in this case.  Exhibit 2 was a transcript of the May 7 call.[2]  Exhibit 3 was a copy of the indictment returned against Smith on May 18, 2018, charging him with the distribution of the fentanyl-laced heroin to Molish on November 13, 2017, in violation of 21 U.S.C. § 841(a)(1).  Exhibit 4 consisted of recordings of 65 phone calls Beach made to Molish from the Jail

---

[1] The statute provision states: "Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to—influence, delay, or prevent the testimony of any person in an official proceeding . . . shall be punished."  18 U.S.C. § 1512(a)(2)(A).

[2] Exhibit 2 was an illustrative exhibit introduced to assist the jury in comprehending Exhibit 1.

between April 27 and May 7, 2018.  We turn now to what this evidence established at Beach's trial.

### A.

On February 9, 2018, Detectives Robert Harrop[3] and Ryan LaGasse, met with Molish "on the street" a short distance from the intersection of Fowler Avenue and North 15th Street in Tampa. Molish was with Beach, whom she began dating after Dykes's death.  Beach liked to do drugs while he was out on the street, especially synthetic marijuana—also known as "spice" or "toochie." He had an extensive criminal record and let the detectives know right away that he was "totally against" the police.

Molish agreed to talk to Detective LaGasse alone.  They had a conversation in his vehicle, and he recorded it.  The conversation focused on the circumstances surrounding Dykes's death.  The detectives wanted Molish to be a witness in a case against Smith, and LaGasse let her know that.  Meanwhile, Detective Harrop talked to Beach in the backseat of Harrop's vehicle.  Beach told Harrop that he was concerned about Molish being charged with homicide because she injected Dykes with the fentanyl-laced heroin.  Harrop said that indicting her was out of the question and "gave [his] word" that she would not be charged.  Nonetheless, Beach let

---

[3] In addition to serving on the Heroin Working Group, Detective Harrop was a "designated agent" with Homeland Security Investigations, the principal investigative arm of the United States Department of Homeland Security.

21-11342                Opinion of the Court                5

Harrop know that he distrusted the detective and would not allow Molish to be interviewed again without a lawyer present.

During her conversation with Detective LaGasse, Molish told him that she paid Smith for the heroin with Dykes's EBT card. The detectives subsequently used this information in surveilling Smith. They discovered that Smith used the EBT card to purchase food at a bodega he and others in the field frequented.

The detectives met with Molish on March 23, 2018, so she could identify Smith from the bodega's CCTV footage. Beach was with her. Molish expressed a desire to assist the detectives in their pursuit of Smith, and as they were in the process of showing her the bodega video footage, Beach became irritated and spoke over Molish, telling the detectives that he would not allow Molish to talk with them because she did not have a lawyer present. After a few minutes, Beach grabbed Molish by the arm and ushered her away from the detectives.

On April 22, 2018, after he was confined in the Jail on a trespass charge, Beach gave Molish his cell phone and tasked her with carrying it while he was incarcerated. From April 27 to May 7, 2018, Beach used the Jail's telephone to place 65 collect calls to his cell phone to talk to Molish.[4] All 65 phone calls were recorded by the Jail using a recording system called ICSolutions, the details of

---

[4] Exhibit 4 contains recordings of 65 *completed* phone calls between Beach and Molish. Beach may have tried to call Molish on other occasions without reaching her, but that is not clear from the record.

which we explain below. Beach paid for the collect calls with money he had in his jail account. Beach's cell phone was also pre-paid, which meant that Molish had to put money on Beach's cell phone while Beach was in jail.

The ICSolutions system recorded all outgoing telephone calls placed by inmates. An automated voice would state the number, date, and time of the phone call. After that, an inmate proceeded through three separate methods of identification before speaking to the party called. First, the ICSolutions automated voice would direct the inmate to enter his inmate identification number using the Jail phone's keypad. Next, the automated voice would direct the inmate to say his first and last name for identification purposes. If the ICSolutions system could not understand the inmate's response, the system would ask the inmate for his name again. If an inmate refused to identify himself, the system would not allow his phone call to go through. Finally, the ICSolutions automated voice would sometimes ask the inmate to participate in a second method of voice identification, directing the inmate to say the phrase "United States" into the phone. It was not until the inmate completed this entire voice identification process that the recipient's phone would ring.[5]

---

[5] If the person called answered her phone, the ICSolutions automated voice would tell her that she had a collect call from the inmate and then play the recording of the inmate saying his name. If she accepted the inmate's call, the automated voice would say how much money the inmate had in his account, notify both parties of the cost of the call per minute, and state a time limit for the call. The exact time limit would depend on how much the phone call cost

The calls between Beach and Molish documented their "volatile" relationship as well as Beach's abusive behavior towards Molish. During some of the 65 calls, Beach and Molish expressed love for one another. In one call on April 30, Beach said that the idea of the two of them breaking up made him want to harm himself. In some calls, Beach asked Molish to marry him, and they excitedly discussed whether Molish might be pregnant. Beach expressed remorse for having "put his hands on Molish" in the past and promised Molish he would never do it again.

On occasion, Beach was verbally abusive towards Molish. Beach threatened Molish with physical violence over her perceived dishonesty. Beach said he'd "break [her] face" or have "this girl Kelly, who whoops girls" for him, "come see" her. Throughout the phone calls, Beach sought to control Molish in a variety of ways—telling her what to do, where to go, and whom she could (or could not) interact with—and demanded constant obedience of his orders as a condition for his love. Molish was afraid of Beach due to his threats and violent behavior.

Beach also blamed Molish for his incarceration. In one call, he told her that he was in jail because she cooperated with law enforcement officials who had a personal vendetta against him. He

---

and how much money the inmate had in his account. Regardless of the balance in the account, however, ICSolutions would disconnect a phone call after 15 minutes. The automated voice would then say, "Thank you for using ICSolutions. You may begin speaking now," after which the inmate and the person he called could begin their conversation.

said the real reason he was arrested for trespassing was because he told Detectives Harrop and LaGasse that they could not talk to Molish without a lawyer present during their February 9 encounter.

Beach and Dykes were part of the same community on the streets, but the two were not close friends. Beach knew about Molish's previous relationship with Dykes and her involvement in the events leading to Dykes's death—including the fact that she injected him with the fentanyl-laced heroin. Beach accused Molish of killing Dykes intentionally, and on several occasions, he warned Molish that he would tell the court about "what [she] did to [Dykes]" if she did not pay his bail bond. Beach also knew about Smith because Smith had a reputation as a "big-time" drug dealer in their community. He referred to Smith by his nickname, "C."

On May 1, 2018, Molish told Beach that Detective LaGasse had come up with a plan whereby she could obtain the $500 she needed to pay Beach's $5,000 bond.[6] The plan? Helping the detectives arrest Smith.

The plan would proceed as follows. Molish would contact Smith and arrange a controlled purchase of crack from Smith. The detectives would observe her as she approached Smith.[7] Once

___

[6] Under Florida law, a criminal defendant can satisfy his bail requirements by posting a bond for the bail. Fla. Stat. § 903.105. The defendant can post a bond by depositing "a sum of money equal to 10 percent of" the required bail with the clerk of the court. *Id*. § 903.105(2).

[7] Molish planned to purchase crack instead of fentanyl from Smith because she had purchased crack from Smith on multiple occasions in the past.

Molish obtained the crack, detectives would arrest Smith and eventually charge him with providing the fentanyl-laced heroin that killed Dykes. They would pay Molish $500 for her efforts.

After Molish told Beach about Detective LaGasse's plan, Beach insisted that she not cooperate, but he doubted Molish was telling the truth when she agreed. Later, Beach insisted Molish put off cooperating until after he was out of jail, and Molish agreed to do so.

*B.*

On May 7, 2018, Beach called Molish from the Jail at 4:14 P.M. She told him that she was on her way "downtown to talk to a federal attorney" and that she was "cooperating" and "trying to get the money to get [him] out" of jail. Evidently anxious, Beach told Molish to "make it happen," adding that she should "let him know . . . we got a big-time crack dealer for him and we got a big-time spice dealer for him."

A short time later, the detectives introduced Molish to an Assistant United States Attorney ("AUSA") to prepare her to testify about her purchase of the drug that killed Dykes. Molish cooperated with the AUSA and provided the testimony she would tell a jury.

After meeting with the AUSA, Molish and the detectives set up the controlled buy with Smith. Molish contacted Smith to arrange a crack purchase. They settled on a time and location for the purchase, and Molish so informed the detectives.

At 7:24 P.M. that same day, while Molish sat with Detective Harrop in his pickup truck awaiting word from Smith, Beach called Molish again. Molish told Beach that she had gone to "see the federal attorney," and that she now was "waiting on 'C' [Smith] to call." Beach said he disagreed with her decision to cooperate with the detectives and that by agreeing to participate in the controlled buy, she put her life at risk because members of the street community do not like law enforcement or people who cooperate with the police. Beach then complained that he was still in jail and questioned why his bond had "not been paid yet." After expressing his disapproval that Molish had unilaterally made a decision to cooperate with the police, Beach told Molish it was "over" between them and hung up on her.

## C.

Beach called Molish again at 7:37 P.M.—his ninth phone call to Molish that day. This phone call formed the basis for Beach's indictment in this case.

At the beginning of the call, Beach repeatedly identified himself to the ICSolutions automated system as "Billy" and input his inmate identification number when prompted. Molish answered the call, telling Detective Harrop, "Billy is calling me." After Molish accepted Beach's call, Beach told her that he had "just thought about something," that he had "nothing to do with none of this shit," and that he needed Molish to "make that clear." When Molish said that she had "made it clear all day long," Beach insisted

that she repeat, "Billy has nothing to do with this shit" out loud so that Detective Harrop could hear it.

Beach again accused one of the deputies of "ha[ving] it out for" him and questioned why he was in jail. He also asked who made the decision to have him arrested for trespassing and who had talked to Molish after he had been arrested. Molish told Beach that Detective LaGasse was going to come to the Jail to talk to Beach about what the detective could do to get Beach out of jail, but Beach told Molish that he would "refuse all that" and that there was nothing for him and the detective to discuss. Beach then insisted that Molish get out of Detective Harrop's truck, adding, "I'm giving you a directive right now, direct order. Get the fuck out of there. Right now." Molish got out of the truck and walked away briefly, telling Beach, "I'm out of the car." Detective Harrop could no longer hear the call, but he could see Molish talking on the phone.

Beach continued to berate Molish, telling her not to come and see him and complaining, "when you initiated your shit my bond should've been paid right then." When Molish said that she agreed with Beach and expressed regret over agreeing to cooperate with the detectives, Beach questioned why she was "agreeing with" and "working with" the prosecution team, and he told Molish that she had "fucked up" by agreeing to cooperate.

Molish then told Beach that she met with the AUSA about testifying in Smith's upcoming trial: "I went and talked to the federal . . . to the federal attorney. . . . [H]e wants me to be a

witness. . . . [H]e said he went through everything, over the case and wants me to be a witness and told me to be safe." Although Molish repeated to Beach that she was only going through with the controlled buy so she could get $500 to pay for his bond, Beach insisted that Molish had been "played" and that she needed to "go hustle" so she could fund his telephone account and "get the fuck away from there cause I know you're still standing there." Molish replied: "I'm not standing next to him at all. . . . I'm walking down the road." At this point, Beach threatened to kill Molish:

> **Beach**: (INAUDIBLE) this is a recording. I have a gun. . .
>
> **Molish**: I'm what?
>
> **B**: . . . I have a gun out there. Somebody left me a gun, put up. Somebody told me where it's at. I'm telling you on this recording phone if you go through with that shit I'm gonna' kill you on this recording phone. I don't give a fuck no more because you straight up disrespected the shit out of me to the utmost.
>
> **M**: How did I . . .
>
> **B**: I . . .
>
> **M**: . . . disrespect you?
>
> **B**: . . . want nothing to do with you anymore. You can keep every fucking thing you have bitch, cunt, whore. I don't want nothing to do with you no more. Do you understand that[?] And if you hang up . . .

Molish hung up on Beach and returned to the truck, crying hysterically. Molish called off the controlled purchase with Smith, so the detectives were unable to locate and arrest Smith that day. Smith was arrested weeks later, when officers found him in possession of both narcotics and firearms. The grand jury in the Middle District of Florida indicted Smith on May 21, 2018, for knowingly and intentionally distributing fentanyl, which caused Dykes's death, in violation of 21 U.S.C. § 841(a) and (b)(1)(C).[8]

## II.

On May 10, 2018, Beach pleaded *nolo contendere* to the trespassing charge, was adjudicated guilty, and was sentenced to time served—which was 18 days as of May 10—allowing Beach to be released from jail.

On June 21, 2018, Beach was indicted in the instant case for threatening a federal witness in violation of 18 U.S.C. § 1512(a)(2)(A). He pleaded not guilty and was tried on December 17, 2018. In its case in chief, the Government established the facts recited in Part I through Detective Harrop's testimony and Exhibits 1, 3, and 4. After Detective Harrop's cross-examination, redirect

---

[8] A jury found Smith guilty on March 4, 2019. Docket, *United States v. Smith*, Case No. 8:18-cr-00235-CEH (M.D. Fla. 2018), Doc. 71. On March 15, 2019, Smith moved the District Court for a new trial. *Id.*, Doc. 84. The District Court granted Smith's motion for a new trial on May 31, 2019. *Id.*, Doc. 95. Smith pled guilty to one count of aiding and abetting the distribution of a mixture and substance containing a detectable amount of fentanyl on January 6, 2020. *Id.*, Doc. 149. On February 3, 2020, the District Court accepted Smith's plea and adjudicated Smith guilty as charged. *Id.*, Doc. 159.

examination, and re-cross examination, the Government rested its case.  Beach then moved the District Court for the entry of a judgment of acquittal.[9]

Beach argued that the Government had "failed to establish a prima facie case of I.D. [and] venue," and that the Government had not met its burden of establishing "the essential elements of the charge . . . as outlined in the jury instructions."  Prior to this point in the trial, however, Beach did not claim that the evidence was insufficient to show that he was the one who had placed the calls or made the threat.  Rather, Beach highlighted that he and Molish talked on the phone 65 times between April 27 and May 7—including ten times on May 7—and that the two had a "volatile" but romantic relationship.

The District Court denied the motion for judgment of acquittal, and the case was submitted to the jury.  Following almost two hours of deliberation, the jury returned a verdict of guilty as charged.

On April 4, 2019, the District Court sentenced Beach to 99 months' imprisonment, followed by three years of supervised release.  The Court departed downward eight levels from the U.S. Sentencing Guidelines sentence range due to Beach's mental and emotional condition, diminished capacity, and drug dependence.

---

[9] *See* Fed. R. Crim. P. 29(a) ("After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.").

On March 5, 2020, Beach moved the District Court to vacate his sentence pursuant to 28 U.S.C. § 2255 on the ground that his attorney was constitutionally ineffective for failing to timely appeal the conviction. On April 9, 2021, the Court granted the motion, vacated Beach's sentence, and reimposed it so that Beach could file a timely notice of appeal. He did so, and that appeal is now before us.

### III.

Beach raises three arguments in his appeal to this Court. First, Beach argues that the law enforcement investigation into Smith did not constitute an *official proceeding* under 18 U.S.C. § 1512. He contends that the threat against Molish related only to the controlled drug purchase—which was part of a law enforcement investigation. Second, Beach argues that he lacked the intent to obstruct an official proceeding because he did not know about or foresee that there would be a grand jury or court proceeding. Third, Beach argues that the Government failed to produce evidence to establish that he was the person who threatened Molish on the phone. Beach contends that the Government's evidence was insufficient because the Government did not authenticate the Jail's recordings or call Molish as a witness to testify that he was the person on the phone with her, instead relying on Detective Harrop's hearsay testimony that Molish told him it was "Billy" on the phone. We address each argument in turn.

### A.

As an initial matter, we will review the first two issues for plain error because they were not specifically raised in the District Court. If an appellant does not preserve an issue on appeal, we review for plain error. *United States v. Straub*, 508 F.3d 1003, 1008 (11th Cir. 2007). To preserve an issue for appeal, a party must object in a way that is "sufficient to apprise the trial court and the opposing party of the *particular grounds* upon which appellate relief will later be sought." *Id.* at 1011 (emphasis added) (quoting *United States v. Dennis*, 786 F.2d 1029, 1042 (11th Cir. 1986)). Under plain error review, the appellant must establish "(1) that there was error (2) that was plain; (3) that affected his substantial rights; and (4) that seriously affected the fairness, integrity, or public reputation of the judicial proceeding." *Id.* at 1008. An error is plain if it is "clear" or "obvious." *United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 1777 (1993).

Although Beach sought an acquittal based on the Government's failure to prove "the essential elements of the charge," this failed to apprise the Court of the particular grounds on which he would later seek appellate relief. *See id.* at 1011. We thus conclude that Beach did not preserve his arguments on appeal that the law enforcement investigation into Smith did not constitute an official procedure under § 1512 and that Beach lacked the intent to obstruct an official investigation because he did not know or foresee it.

The federal witness tampering statute makes it unlawful for any person to use physical force against a person, or threaten to do so, with intent to influence, delay, or prevent the testimony of any person in an "official proceeding." 18 U.S.C. § 1512(a)(2)(A). An "official proceeding," as used in the statute, includes "a proceeding before a judge or court of the United States . . . or a Federal grand jury." 18 U.S.C. § 1515(a)(1)(A). Law enforcement investigations are not listed as "official proceedings" in the statute. *See id.* However, a defendant can be convicted for federal witness tampering even if "an official proceeding [is not] pending or about to be instituted at the time of the offense." *Id.* § 1512(f)(1).

Beach's first argument—that the law enforcement investigation into Smith did not constitute an official proceeding under 18 U.S.C. § 1512(a)(2)(A)—fails because the law enforcement investigation is not the official proceeding in question. The official proceeding would be a trial or grand jury proceeding against Smith, not the investigation. That proceeding need not have already begun. As further discussed below, it is enough that Beach foresaw such a proceeding.

*B.*

Beach's second argument is that the District Court erred when it denied his motion for judgment of acquittal because the Government failed to present sufficient evidence that Beach intended to obstruct an official proceeding.

We will uphold a district court's denial of a motion for judgment of acquittal "if a reasonable trier of fact could conclude that

the evidence establishes the defendant's guilt beyond a reasonable doubt." *United States v. Holmes*, 814 F.3d 1246, 1250 (11th Cir. 2016) (quoting *United States v. Rodriguez*, 218 F.3d 1243, 1244 (11th Cir. 2000)).  In reviewing a district court's denial of a motion for judgment of acquittal, we view the facts in the light most favorable to the government and draw all reasonable inferences in favor of the jury's verdict.  *United States v. Clay*, 832 F.3d 1259, 1293 (11th Cir. 2016).  "We will not overturn a jury's verdict if there is '*any reasonable construction* of the evidence [that] would have allowed the jury to find the defendant guilty beyond a reasonable doubt.'"  *United States v. Martin*, 803 F.3d 581, 587 (11th Cir. 2015) (alteration in original) (emphasis added) (quoting *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011)).  The evidence need not exclude every reasonable hypothesis of innocence, however, for a reasonable jury to find guilt beyond a reasonable doubt.  *United States v. Cruz-Valdez*, 773 F.2d 1541, 1545 (11th Cir. 1985) (en banc).  The jury is free to choose among alternative, reasonable interpretations of the evidence.  *Id.*

The test for sufficiency of the evidence is identical regardless of whether the evidence is direct or circumstantial.  *United States v. Mieres-Borges*, 919 F.2d 652, 656–57 (11th Cir. 1990).  But where the government seeks to meet its burden of proof based on circumstantial evidence, it must rely on reasonable inferences in order to establish that a "reasonable factfinder could conclude that the evidence establishes guilt beyond a reasonable doubt."  *Id.* at 656.

1.

Before determining whether the Government presented sufficient evidence of intent, we must first address what intent means with respect to this statute. We conclude that the portion of the federal witness tampering statute at issue in this appeal—18 U.S.C. § 1512(a)(2)(A)—is subject to the nexus requirement described below. If a jury could reasonably find a nexus between Beach's actions and the Smith proceeding, the Government presented sufficient evidence of intent.

According to both the United States Supreme Court and this Court, a person accused of obstructing official proceedings can only be convicted if the government can prove a "nexus" between the accused's actions and the relevant judicial proceedings. This standard is known as the "nexus requirement." In *United States v. Aguilar*, the Supreme Court held that the government needed to satisfy the nexus requirement to convict a defendant of obstruction of justice under 18 U.S.C. § 1503. 515 U.S. 593, 599–600, 115 S. Ct. 2357, 2362 (1995). To satisfy the nexus requirement, the Court explained, "it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority." *Id.* at 599. The Court held that the nexus requirement is only satisfied if the accused's act had "a relationship in time, causation, or logic with the judicial [or grand jury] proceedings" at issue in the case. *Id.*

The Supreme Court subsequently extended the "nexus" requirement to 18 U.S.C. § 1512(b)(2)—a related statute that

prohibits persuading someone to withhold testimony or documents from an official proceeding.[10] *Arthur Andersen LLP v. United States*, 544 U.S. 696, 707–08, 125 S. Ct. 2129, 2136–37 (2005). The Court held that, as in *Aguilar*, to satisfy the nexus requirement for a conviction under 18 U.S.C. §1512(b)(2), the government must prove that the defendant knew that "his actions [were] likely to affect the judicial proceeding." *Id.* at 708, 125 S. Ct. at 2137 (quoting *Aguilar*, 515 U.S. at 599, 115 S. Ct. at 2362).

In *United States v. Friske*, this Court expanded the nexus requirement to 18 U.S.C. §1512(c)(2)[11]—another related statute, which prohibits obstructing an official proceeding by tampering

---

[10] The specific portion of 18 U.S.C. § 1512(b)(2) at issue in *Arthur Andersen* was § 1512(b)(2)(A), which states:

> Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . . cause or induce any person to . . . withhold testimony, or withhold a record, document, or other object, from an official proceeding . . . shall be fined under this title or imprisoned not more than 20 years, or both.

*Id.; see Arthur Andersen*, 544 U.S. at 703, 125 S. Ct. at 2134.

[11] According to 18 U.S.C. § 1512(c)(2): "Whoever corruptly . . . otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so . . . shall be fined under this title or imprisoned not more than 20 years, or both." *Id.* In *Friske*, we noted that, by extending the nexus requirement to 18 U.S.C. § 1512(c)(2), we were joining our sister circuits that had already decided that the nexus requirement applies to 18 U.S.C. § 1512(c). *See Friske*, 640 F.3d at 1292 (collecting cases).

with evidence. 640 F.3d at 1292. Relying on the discussions of the nexus requirement in *Arthur Andersen* and *Aguilar*, we held that a defendant must have at least *foreseen* an official proceeding to have the requisite intent for a conviction. *Id.* In the context of a § 1512(c)(2) conviction, to show a "nexus" of intent, "the government must prove that the defendant knew of or foresaw an official proceeding, and knew that his actions were likely to affect it." *Id.* at 1292 n.5.

Although we have not yet ruled on the question of whether § 1512(a)(2)(A) contains a nexus requirement, both this Court and the Supreme Court have held that the nexus requirement applies to other provisions in § 1512.[12] *See Arthur Andersen*, 544 U.S. at 707–08, 125 S. Ct. at 2136–37; *Friske*, 640 F.3d at 1292. These provisions—along with § 1503, which the Supreme Court held was also subject to the nexus requirement[13]—serve a common purpose: to prevent individuals from interfering with official proceedings. Because § 1512(a)(2)(A) also serves this purpose, we hold that § 1512(a)(2)(A) is also subject to the nexus requirement.

### 2.

Having determined that § 1512(a)(2)(A) is subject to the nexus requirement, we find that, in this case, a jury could reasonably conclude from the evidence presented at trial that the nexus

---

[12] Our sister circuits have also extended the nexus requirement to different provisions in § 1512. *See supra* note 11.

[13] *See Aguilar*, 515 U.S. at 599–600, 115 S. Ct. at 2362.

test was satisfied. That is, there was sufficient evidence of Beach's intent to influence an official proceeding. Evidence from the record supports the conclusion that Beach's threats were related to official proceedings in connection with the Smith investigation—not to the controlled purchase—and that Beach foresaw the official proceedings and thus possessed the requisite intent to obstruct.

To determine whether the nexus test is satisfied in this case, we must consider whether Beach's threats had "a relationship in time, causation, or logic" with Smith's upcoming grand jury proceeding and trial. *See Aguilar*, 515 U.S. at 599, 115 S. Ct. at 2362. Beach need not have *known* that official proceedings were imminent when he threatened Molish, but he must have at least *foreseen* such proceedings for his threats to have a relationship to them. *See Friske*, 640 F.3d at 1292.

Looking at the transcript of Beach and Molish's phone conversation, a jury could reasonably conclude that Beach's threat—based on its timing—was related to Molish's upcoming testimony. Immediately before Beach threatened her, Molish specifically told Beach that she was talking to a federal prosecutor about being a *witness* in Smith's case. Beach did not threaten Molish when the two were discussing the possibility of her completing the controlled purchase with Smith; it was only *after* Molish expressed a desire to testify in Smith's trial that Beach threatened her. There is also evidence outside this transcript from which a jury could reasonably conclude that Beach threatened Molish because he did not want her to testify in Smith's upcoming trial. For example, during

their last conversation—minutes after the phone call containing the threat at issue—Beach angrily asked Molish if she had "signed a piece of paper" indicating that she was going to cooperate with law enforcement.

A jury could also reasonably conclude from other evidence in the record that Beach had foreseen official proceedings in connection with the Smith investigation when he threatened Molish. The clearest evidence that Beach anticipated official proceedings in connection with the Smith case is Beach's statement to Molish that Beach was in jail because of her "case." Beyond this statement, however, there is plenty of evidence in the record to support the jury's conclusion that Beach foresaw official proceedings in connection with the Smith investigation. As Detective Harrop noted during his testimony, Beach was aware of the federal attorney's wishes for Molish to be a witness in Smith's upcoming federal court case. The fact that Smith had not been indicted when Beach threatened Molish is not dispositive. An official proceeding need not be instituted at the time of the offense to support a conviction for federal witness tampering. *See* 18 U.S.C. § 1512(f)(1).

Beach also knew that Molish had talked to the federal attorney about testifying as a witness in the proceedings. A reasonable layperson—and especially someone, such as Beach, who had experience with the criminal justice system—could infer from Molish's conversation about being a witness in Smith's case that she would be part of a pending grand jury or other court proceeding. Detective Harrop also testified that during their conversation, Beach

expressed concern that Molish could be charged with homicide if she cooperated with law enforcement. A jury could reasonably infer from this evidence that Beach anticipated that the detectives' investigation of Smith would result in court proceedings of some kind.

In sum, evidence from various sources in the record supports the jury's finding that Beach anticipated the existence of official proceedings and threatened Molish in relation to, and with the intent to prevent, her participation in them.

### C.

Finally, the Government produced sufficient evidence for a reasonable jury to conclude that Beach was the one who threatened Molish in the recorded phone calls. We review a challenge to the sufficiency of the evidence and the denial of a Rule 29 motion for judgment of acquittal *de novo*. *United States v. Chafin*, 808 F.3d 1263, 1268 (11th Cir. 2015).

First, the recordings of the 65 phone calls Beach made to Molish during his incarceration from April 22 to May 10 provide all the necessary information to establish that Beach was the caller. The ICSolutions phone system at the Jail uses a complex, multistep identification process. In placing these calls, Beach was required to enter his inmate identification number using the Jail phone's keypad and state his first and last name. If the ICSolutions system didn't understand his response, the system would have asked for his name again, not allowing Beach to place the call until he identified himself. In some cases, Beach may have been

prompted to participate in a second method of voice identification, directing him to say the phrase "United States" into the phone. From this information, we conclude that the District Court had ample evidentiary support for its conclusion that the Government met its burden of proof in identifying Beach as the caller who threatened Molish.

The circumstantial evidence also points to the obvious conclusion that Beach was the caller. He identified himself as "Billy" on every phone call and placed the calls to *his own cell phone*. Given the circumstances, it is extremely unlikely anyone else in the Jail would have known Beach's cell phone number. And even if someone did happen to know the cell phone number, that person would not have identified himself as "Billy" on *every single phone call*. Beach also paid for the phone calls on his account at the Jail. In light of this circumstantial evidence, any conclusion that Beach was not the caller strains credulity beyond its limits. The District Court certainly did not err by refusing to grant Beach's motion for judgment of acquittal on identification grounds.

## IV.

We are not persuaded by any of Beach's arguments. Molish was preparing to testify as a witness in an upcoming grand jury proceedings and possible trial against Smith. The evidence in the record can reasonably support the conclusion that Beach threatened Molish in relation to those upcoming proceedings, and that Beach possessed the requisite intent to obstruct an official proceeding. Furthermore, a reasonable jury could have concluded that

26                    Opinion of the Court                    21-11342

Beach was the caller who threatened Molish.  Accordingly, the District Court's judgment is

**AFFIRMED.**