**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-13853

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

LAWRENCE COLEY, III,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:23-cr-00092-ECM-KFP-1

_____

Before ABUDU, KIDD, and ANDERSON, Circuit Judges.

PER CURIAM:

Lawrence Coley, III, was convicted for distribution of fenta-nyl resulting in death and possession with intent to distribute fen-

tanyl, in violation of 21 U.S.C. § 841(a)(1). He now appeals, challenging the district court's denial of his motion for a judgment of acquittal because the evidence was insufficient to support his conviction for distribution of fentanyl resulting in death. After careful review, we affirm.

## I. BACKGROUND

On March 7, 2023, a federal grand jury indicted Coley with (1) distribution of fentanyl resulting in death of Gerald Conner, in violation of 21 U.S.C. § 841(a)(1) (Count 1), and (2) possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a)(1) (Count 2). Coley pleaded not guilty to both counts.

Coley proceeded to trial in August 2024. The government called to testify Detective Joseph A. Smith, a homicide investigator with the Montgomery Police Department. Smith testified that on August 26, 2022, he arrived at the site of Conner's death at 8:47 p.m., after medics and police patrol had been at the scene and Conner had been declared dead. He learned from Conner's family that Conner had a history of narcotics use, particularly pain pills. Upon examining the scene, Smith saw Conner's car was pulled into the driveway of his home and was told the car was still running when responders first arrived. Conner was sitting inside the car's driver's seat, with his head leaning down and his right hand on the console. Based on the amount of condensation from the air conditioning dripping from underneath the car, Smith determined the car must have been running for "a long time" before Conner's body was discovered. While searching the car, Smith found a bag of McDonald's

in the passenger seat and a fully melted McDonald's iced coffee in the cup holder, but no narcotics. Smith also noticed the pooling of Conner's blood called lividity, which occurs once a person's blood is no longer flowing and settles in certain areas. Conner had lividity in his face and in his hand, where his right arm was propped up.

Detective Smith further testified that, a few days later, Conner's sister turned over his cell phone to Smith because she believed one of the last numbers Conner had contacted was suspicious. After downloading data from the cell phone, Smith determined the phone number was registered to Coley. Smith also retrieved text messages from Conner's phone to Coley. On August 25, the day before Conner's death, Coley sent Conner a text message saying, "if you didn't get 2 last week and be +20. . . I HAVE to send them Everything before they set the next trip. It's definitely gonna be Next Week," to which Conner replied, "That's cool. I just will get the 2 you have saved." The conversation continued the next day, with Conner texting Coley at 5:15 a.m.: "Just sent you 80. Can you meet me at the Marathon [gas station] at 5:45," to which Coley says "Ok." At 5:45 a.m., Conner texted Coley again saying, "How far away are you? I'm in the McDonald's drive thru and will be at the Marathon in a minute," then two minutes later said, "I see you."

Along with the text messages, Detective Smith testified that he reviewed Conner's transaction history from a payment platform app called Cash App, which is used to send money from person to

4                    Opinion of the Court                    24-13853

person, and found that on August 26, Conner sent Coley $80. Additionally, Conner had been sending Coley funds since January 2021.

Detective Smith testified that Conner's mother saw him at home in the morning on August 26, and Conner was pronounced dead at 7:08 p.m. He stated that no one searched Conner's home and that law enforcement were unable to get security footage from the nearby Marathon gas station to see if it had captured Conner and Coley meeting on the morning of August 26 because the store kept its security footage for only two days, and it was no longer available by the time Smith inquired about it.

The government then called as a witness Mary Ellen Mai, a forensic scientist working in the Alabama Department of Forensic Sciences ("ADFS") toxicology section. Mai testified that she prepared the toxicological analysis of Conner's blood. After Conner's blood test showed a presumptive positive for fentanyl, she ran a confirmatory test that found Conner's blood contained fentanyl at a concentration of 25 nanograms per milliliter ("ng/ml"), as well as fluorofentanyl, a close derivative of fentanyl.

Mai confirmed that blood samples can be drawn from other areas of the body besides the chest cavity, where Conner's samples were taken, such as the femoral vein, which provides a more accurate picture of the blood at the time of death. She confirmed that one of the reasons a chest blood sample can be less accurate is because of postmortem redistribution, which is the process during which concentrations of a substance like fentanyl can transfer from

a location like an organ into the bloodstream. She stated that, because of postmortem redistribution, there may have been a higher concentration of fentanyl in Conner's blood when the blood samples were taken during his autopsy than at the time of his death, but that chest blood remains a valid sample to test. Mai also confirmed that no testing was done on Conner's blood samples to quantify the impact, if any, of postmortem redistribution.

Next, the government called to testify Dr. Curt E. Harper, the chief toxicologist for the ADFS, who testified as an expert in the field of forensic toxicology and conducted an independent supervisory review of the case. Harper testified that two of the most important factors that contribute to the occurrence of postmortem redistribution are the level of the body's decomposition, with severe decomposition increasing the likelihood, and the time elapsed between death and the sampling of the blood. The three days passing between Conner's death and his autopsy was a typical timeframe. Conner's body's level of decomposition was noted as moderate, so "there [was] some possibility for postmortem redistribution to occur." Harper explained that research on fentanyl postmortem redistribution has shown an average difference in fentanyl concentration in a central blood sample, like the chest cavity, and a peripheral blood sample, like the femoral vein, to be two to threefold higher.

Next, Dr. Harper testified that the ADFS had over 700 fentanyl overdoses the prior year, and the median fentanyl concentration in those overdose cases was 15 ng/ml, but inexperienced users

can overdose on as little as 3 ng/ml of fentanyl, whereas regular users can tolerate concentrations of 25 ng/ml or much higher without overdosing. Based on his experience, 25 ng/ml is consistent with a lethal concentration of fentanyl, but toxicology is "one piece of the puzzle" in determining the ultimate cause of death.

Dr. Harper testified that there was no way to quantify the amount of postmortem redistribution that may have occurred in Conner's case. He could not say for certain that the concentration of fentanyl in Conner's blood at the time of his death was 25 ng/ml because some postmortem redistribution could have occurred and based on the two to threefold postmortem redistribution in concentration, it may have been 8 ng/ml or 12 ng/ml. He confirmed that a concentration of 8 to 12 ng/ml of fentanyl in a person's blood could be lethal.

Next, the government called Dr. Edward Reedy, the chief medical examiner for the ADFS. Reedy testified that based on photographs from Conner's autopsy, he observed no signs of trauma on Conner's body, and the lividity in the photos was consistent with him dying in a seated position. He stated that, in his experience, he had seen fentanyl overdoses with concentrations from 3-4 ng/ml to 30-40 ng/ml, with on average anything over 10 ng/ml being fatal. He stated that, based on only the photographs from the autopsy, the toxicology report, and the police's death investigation report, he could not completely rule out other causes of death such as stroke, heart disease, or cancer, but he did remark that Conner did "have an appearance of being quite healthy."

The government then called to the stand Josh Taylor, who had been longtime friends with Conner. Taylor testified that he and Conner were in almost daily contact, and both struggled with drug addiction to pain medication. At some point in 2022, Conner connected Taylor with Coley so Taylor could illegally obtain more pain pills. Conner and Coley worked together, and at first Taylor went through Conner to get to Coley, but later he would contact Coley directly to get more pills. Taylor bought round, blue pills from Coley that were supposed to be oxycodone 30 milligram pills. After Conner's death, Taylor cooperated with the Montgomery Police Department to buy pills from Coley two more times. Each time he met with Coley, Taylor purchased two round, blue pills that looked identical to the ones he had previously purchased, for $40 per pill, or $80 per transaction. Taylor did not recall Conner saying he could buy drugs from anyone besides Coley, and Taylor also purchased only from Coley. When asked about text messages he exchanged with Conner the day before Conner died, Taylor denied that his text saying he had some coffee and creamer was coded language for anything else.

The government's next witness was Detective Adam Wright, who in 2022 was employed as a narcotics officer by the Montgomery Police Department and as a task force officer by the Drug Enforcement Agency ("DEA"). Wright testified that he helped to orchestrate the two controlled buys by Taylor from Coley in October 2022, and he stated that the pills Taylor purchased each time were two blue "M30" counterfeit oxycodone pills that turned out to be fentanyl pills. After the controlled buys,

Wright obtained a search warrant for Coley's residence and executed it on November 2, 2022. During the search, Wright and his team found an unlabeled pill bottle that had 70 blue M30 fentanyl pills inside in a dresser in the master bedroom. While Coley's house was being searched, detectives pulled Coley over and found in his possession additional blue M30 pills. The detectives also seized Coley's phone in Coley's car. Detectives extracted data from Coley's phone, including text messages and Cash App transaction history, as well as records directly from Cash App from Conner's account. From January 2021 to August 2022, Conner sent Coley approximately $24,000 through Cash App, mostly in increments of multiples of $20 or $30, the common street prices for blue M30 pills. Conner never sent money using Cash App to anyone other than Coley.

Finally, the government called to testify Chad Chumbley, who in 2022 was a senior forensic chemist with the DEA. Chumbley tested tablets from four exhibits: (1) exhibit 13A, pills from Taylor's first controlled buy; (2) exhibit 15A, pills from Taylor's second controlled buy; (3) exhibit 18A, pills from the bottle seized during the search of Coley's residence; and (4) 16A, pills confiscated from Coley during the traffic stop. Chumbley prepared a report for each exhibit, identifying fentanyl, para-fluorofentanyl, and acetaminophen in the pills.

After the government rested its case, Coley made a Fed. R. Crim. P. Rule 29 motion, arguing that the government had not pro-

vided sufficient evidence as to Count 1. Coley argued that the government presented no evidence that he had met Conner on the day of Conner's death or sold him drugs, or that if he did, that Conner ingested those drugs. He also argued that there was no dispute that postmortem redistribution of fentanyl could have occurred or that the concentration of fentanyl measured in Conner's blood may not have been a fatal dose for a longtime opioid user like Conner. The district court ruled that the there was sufficient evidence to sustain a conviction on Count 1 and denied the motion.

Coley called his first witness, Ashley Edwards, an investigator at the Federal Defender's Office for the Middle District of Alabama. First, she explained that in a drug-related investigation, she looks for evidence of sales, transactions, meeting locations, and other similar information. During her work as an investigator on Coley's case, Edwards reviewed text messages on Coley's cell phone, including text messages from Conner to Coley in 2021 such as "[g]ot some people still wanting some. Let me know if you make trip anytime," "[y]ou planning on going after work? Trying to get orders taken," and "Brian wants to pick up a four pack this morning. I will let you know when he wants to pick up," which stood out to Edwards as evidence of drug transactions.

Next, Coley called Matthew Greimel, a retired DEA agent and expert witness in drug use and drug distribution. Greimel testified that in his experience, many drug users will sell drugs or trade drugs among themselves to support their habit, as a drug habit can become expensive. He also explained it is common for drug users

to use slang or code words when messaging about drugs, and that the word coffee is a slang term for heroin. He stated that it is common for drug users to have multiple suppliers. He added that it was highly unusual for a dealer to use Cash App instead of cash because it creates evidence of the transactions, and based on his review of Conner's and Coley's transaction history, the varying payment amounts for each transaction could indicate the purchase of different quantities or kinds of drugs. Lastly, based on text messages he reviewed and Taylor's testimony, Greimel stated that the conversation between Conner and Taylor the day before Conner's death about coffee and creamer appeared to be a coded conversation about drugs, with coffee potentially meaning heroin and creamer potentially meaning methamphetamine.

Coley finally called Dr. Susan Skolly-Danziger, an expert witness in the field of forensic toxicology. Skolly-Danziger compared the reports analyzing Conner's blood samples with the results of the DEA tests of the drugs seized from Coley. She testified that the test results were not perfect matches because, although both Conner's blood and the drug samples contained fentanyl and fluorofentanyl, the pill samples contained para-fluorofentanyl, a specific type of flurofentanyl, and acetaminophen. She added that the ADFS did not test Conner's blood for norfentanyl, a breakdown product created as the body metabolizes fentanyl. The presence or lack of norfentayl in Conner's blood could have provided insight into whether he died shortly after ingesting fentanyl or whether some time had elapsed before his death and his body had a chance to begin metabolizing the drug.

Neither side had any objections to the jury instructions explaining the counts of the indictment. Coley renewed his motion for a judgment of acquittal, which the district court again denied, finding that there was sufficient evidence for a jury to find Coley guilty of Count 1. The jury found Coley guilty on both counts. The district court sentenced Coley to 240 months of imprisonment for Counts 1 and 2 to be served concurrently, followed by five years of supervised release for Count 1 and three years of supervised release for Count 2, to be served concurrently. Coley filed a timely notice of appeal.

## II. STANDARD OF REVIEW

We review de novo a challenge to the sufficiency of the evidence and the denial of a Rule 29 motion for a judgment of acquittal. *United States v. Beach*, 80 F.4th 1245, 1258 (11th Cir. 2023). When reviewing the denial of a motion for judgment of acquittal, we view all facts and inferences in the light most favorable to the government. *Id.* at 1255. We will uphold the district court's denial of a motion for a judgment of acquittal "if a reasonable trier of fact could conclude that the evidence establishe[d] the defendant's guilt beyond a reasonable doubt." *Id.* (citation modified). "We will not overturn a jury's verdict if there is any reasonable construction of the evidence that would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *Id.* (citation modified).

## III. DISCUSSION

To support a conviction under 21 U.S.C. § 841(a)(1), the government must show that the defendant knowingly or intentionally

distributed a controlled substance. There is a penalty-enhancement provision for § 841(a), which provides that a defendant shall be sentenced to a term of not less than 20 years of imprisonment, or more than life, if the defendant distributed a Schedule I or II drug and death or serious bodily injury "results from the use of such substance." 21 U.S.C. § 841(b)(1)(C). The government must prove that the use of the drug was the but-for cause of the victim's death. *See Burrage v. United States*, 571 U.S. 204, 211 (2014). "Because the 'death results' enhancement increase[s] the minimum and maximum sentences to which [a defendant is] exposed, it is an element that must be submitted to the jury and found beyond a reasonable doubt." *Id.* at 210. Fentanyl is a Schedule II controlled substance. 21 U.S.C. § 812(c) Schedule II (b)(6).

On appeal, Coley argues that the district court erred in denying his motion for a judgment of acquittal because there was insufficient evidence for a jury to find that Coley sold pills containing fentanyl to Conner that were the but-for cause of Conner's death. Coley first states that the government did not prove that Coley actually met with or gave Conner pills containing fentanyl on the day of his death or prove that Conner ingested the pills rather than redistributing them to others. Additionally, he contends that no one knows for sure what Conner did between being seen at home by his mother in the morning on August 26 and around 7:00 p.m., when he was found dead. Second, Coley argues that due to postmortem redistribution, it is impossible to know the concentration of fentanyl in Conner's blood at the time of his death, and that although 25 ng/ml was more than an average fatal dose of fentanyl

in Alabama, habitual opioid users like Conner can develop a tolerance for far higher concentrations without overdosing. Coley noted that the government experts testified that the amount of fentanyl in Conner's blood was just one part of the equation, and Dr. Reedy could not definitively rule out another cause of death such as heart disease or stroke. Third, Coley asserts that the government did not prove that Coley distributed the fentanyl found in Conner's blood because Conner would redistribute some of the drugs he bought from Coley to others rather than ingesting them himself, and his text messages and varying transaction amounts imply he bought drugs other than just fentanyl from Coley. Coley points to text messages from Taylor from the day before Conner's death, which most likely indicated he had drugs he wanted to share with Conner. Coley argues the government "asked the jury to infer that Mr. Coley must have distributed [the] fentanyl" to Conner because of the blue M30 pills obtained from the two controlled buys and the search of Coley's home, despite the toxicology report for those pills not being "an exact match" for the results from Conner's blood.

We hold that the district court did not err in denying Coley's motion for a judgment of acquittal because there is sufficient evidence for a reasonable trier of fact to conclude that Conner died from an overdose caused by ingesting fentanyl-laced pills that he had purchased from Coley earlier that day. Although the government did not provide video or witness testimony of Coley and Conner meeting on August 26, the government did present text mes-

sages between them on August 25 and 26 agreeing to meet so Conner could purchase drugs for $80, with Conner's last text message being "I see you" on the morning of August 26. These text messages matched an $80 Cash App transaction from Conner to Coley that same morning. The Cash App transaction history also demonstrated that Conner had transferred approximately $24,000 to Coley from January 2021 to August 2022, and that Conner never used Cash App to conduct transactions with anyone besides Coley. Additionally, Coley's close friend Taylor testified that, to the best of his knowledge, Conner only ever purchased drugs from Coley, and that the pills Taylor purchased during the two controlled buys after Conner's death matched the kind of pills he and Conner had always purchased from Coley in the past. Lastly, the government showed that, at the time of autopsy, the concentration of fentanyl in Conner's blood was 25 ng/ml, which may not have been the concentration at death or a lethal amount for regular users, but it was higher than the median amount of 15 ng/ml found in overdose cases the prior year in Alabama.

In sum, the circumstantial evidence viewed in the light most favorable to the government is sufficient for a jury to have rationally concluded that Coley distributed fentanyl to Conner on the day of his death and that fentanyl was the but-for cause of Conner's death. *See Beach*, 80 F.4th at 1255; *see also United States v. Guevara*, 894 F.3d 1301, 1307 (11th Cir. 2018) (noting that the test for sufficiency of evidence is the same regardless of whether the evidence is direct or circumstantial, with no distinction in the weight given

to each). The government was not required to disprove every potential hypothesis, and the jury was free to find the testimony of the government witnesses as more credible. *See Beach*, 80 F.4th at 1255–56.

## IV. CONCLUSION

We **AFFIRM** the district court's denial of Coley's motion for a judgment of acquittal as to Count 1.